**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Claude "Buddy" LEACH, Defendant–Appellant.**

No. 80–3041.

United States Court of Appeals, Fifth Circuit.

Unit A

Dec. 19, 1980.

---

Miller, Cassidy, Larroca & Lewin, William H. Jeffress, Jr., Seth P. Waxman, Washington, D. C., for defendant–appellant.

D. H. Perkins, Jr., John P. Lydick, Michael H. Wainwright, Asst. U. S. Attys., Shreveport, La., for plaintiff–appellee.

Before WISDOM, AINSWORTH and GEE, Circuit Judges.

AINSWORTH, Circuit Judge:

■ Claude "Buddy" Leach, a United States Congressman, appeals from the order of the district court denying his motion to dismiss the indictment against him alleging election irregularities on the ground of collateral estoppel.[1] Leach contends that the factual issues involved in the present indictment for receiving illegal campaign contributions were conclusively determined in his favor at his previous trial for "vote buying." We agree, vacate the order of the district court, and order dismissal of the indictment.

Congressman Leach was elected to the House of Representatives by a narrow margin on November 7, 1978.[2] His district, encompassing eight parishes in northwestern Louisiana, included Leesville, Leach's home town. The undisputed evidence at trial showed that a number of persons from one precinct in Leesville were paid to vote for certain candidates, including Leach. The vote–buying scheme appears to have involved several persons, among them Ralph McRae, Jr., the Mayor of Leesville at the time; his father, Ralph McRae, Sr.; Robert Pynes, a Leesville merchant; and

---

1. Jurisdiction for this case comes under 28 U.S.C. § 1291, which permits "appeals from all final decisions of district courts ...." While the denial of a motion to dismiss an indictment may not appear to be a final order, "a pretrial order denying a motion to dismiss an indictment on double–jeopardy grounds ... falls within the 'small class of cases' that Cohen [v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)] has placed beyond the confines of final–judgment rule."

*Abney v. United States*, 431 U.S. 651, 659, 97 S.Ct. 2034, 2040, 52 L.Ed.2d 651 (1977) (footnote omitted).

2. Leach's margin of victory was only 266 votes. In the precinct in which the vote buying allegedly took place, the vote total was 650 for Leach to 49 for his opponent. Transcript at 1461, 1464.

Willie Fisher, who allegedly made the actual arrangements to transport voters to the polls and pay them for their votes.[3]

Leach, his law partner Edwin Cabra, and another man who pleaded guilty before trial, were named in a fifteen–count indictment. Counts One through Eleven alleged that all three defendants participated in the vote–buying scheme.[4] The remaining four counts, applicable only to Leach, alleged that he had received illegal campaign contributions.[5] On the motion of Cabra, which was opposed by both the Government and Leach, the campaign–contribution counts were severed from the vote–buying counts.[6] Leach and Cabra were tried before a jury and found not guilty of the vote–buying counts on November 3, 1979. On November 15, 1979, the grand jury returned a superseding indictment on the campaign–contribution counts. It is that indictment which Leach now seeks to set aside.

Leach's contention that collateral estoppel bars trial on the campaign–contribution counts is based on the Supreme Court's decision in *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). In *Ashe*, the defendant was tried and acquitted on a charge of armed robbery of one of the six participants in a poker game. The state then prosecuted him for the robbery of another of the poker players, this time obtaining a conviction. The Supreme Court ruled that the second trial was barred by collateral estoppel:

> "Collateral estoppel" is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when a [sic] issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.

397 U.S. at 443, 90 S.Ct. at 1194. In addition to stating the rule of collateral estoppel, and holding that collateral estoppel in a criminal case is embodied in the Fifth Amendment's guarantee against double jeopardy, the Supreme Court held that courts should take a nontechnical, common-sense approach in deciding whether an issue has been previously decided:

> The federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury

3. In addition to the three men indicted, the original indictment listed 19 persons involved in the vote–buying and the campaign–contribution allegations. Several of these persons, including former Mayor McRae and his father, entered into plea–bargaining agreements with the Government in return for their testimony.

4. Count One alleged a general conspiracy to pay voters over a two–month period in violation of 18 U.S.C. § 371. Counts Two through Eleven alleged substantive offenses of paying particular named voters for their votes, in violation of 18 U.S.C. § 2 and 42 U.S.C. § 1973i(c).

5. Count Twelve alleged that Leach had accepted an aggregate contribution of $5,000 from Ralph McRae, Sr., in violation of 2 U.S.C. §§ 441a & 441j; Counts Thirteen through Fifteen alleged that Leach had "aid[ed] abet[ted] and cause[d]" John Ford (through Ralph

McRae, Jr.), Ralph McRae, Sr., and Robert Pynes to make contributions of over $100 in cash, in violation of 2 U.S.C. §§ 441g & 441j and 18 U.S.C. § 2. The superseding indictment essentially followed the last four counts of the original indictment, and added one count involving a cash contribution from Ray Pynes made through Robert Pynes.

6. Cabra sought severance of his trial from that of Leach. Record on Appeal, Pleadings Vol. 1 at 260. Judge Veron denied Cabra's motion, but ordered severance of Counts Twelve through Fifteen, finding "that the alleged campaign contribution violations are not part of the transaction or series of transactions constituting an offense charge against Edwin L. Cabra." Record on Appeal, Pleadings Vol. 2 at 576.

could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Sealfon v. United States*, 332 U.S. 575, 579, 68 S.Ct. 237, 240 [92 L.Ed. 180]. Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal.

397 U.S. at 444, 90 S.Ct. at 1194 (footnotes omitted). In the present case, we must thus determine whether the jury in the vote–buying trial rationally could have acquitted Leach without determining in his favor the issues crucial to the campaign–contribution charges.[7]

██ In its ruling denying Leach's motion to dismiss the indictment, the district court stated that "[i]t is entirely possible that the jury could have believed that Mr. Leach received these contributions and still believed that he was not a member of a conspiracy to pay voters." Record on Appeal, Pleadings Vol. 4 at 1222. In its brief, the Government also maintains that collateral estoppel is inappropriate because the jury may have found merely that Leach was not part of the conspiracy. This is, of course, plausible in theory, but "[t]he most obvious difficulty [with this] is that the

[government] did not try its case on that theory." *McDonald v. Wainwright*, 493 F.2d 204, 206 (5th Cir. 1974). To accept the district court's reasoning would be to adopt just the kind of "hypertechnical and archaic approach" which *Ashe* cautions against. While it technically would have been possible for the jury to decide that Leach was not a member of the conspiracy without also deciding that he did not accept the contributions, the record does not support such a conclusion.

The vote–buying trial was a classic swearing contest. The Government's leading witness was Ralph McRae, Jr., the former Leesville mayor.[8] Perhaps his most damaging testimony was in regard to a meeting he and his father had with Leach at Leach's home. McRae testified that his father gave Leach $4,000 in cash at that meeting, that Leach in turn gave $1,000 of that money to Ralph McRae, Jr. to finance the vote–buying scheme, and that the three men generally discussed the "commercial vote" operation.[9] Leach, on the other hand, acknowledged that the meeting took place, but denied receiving any money from Ralph McRae, Sr., giving any money to Ralph McRae, Jr., or discussing vote buying.[10] Similarly, the Government presented evidence that Ralph McRae, Jr. gave Leach $500 in cash and that Robert Pynes gave him $1,000 in cash. Leach flatly denied receiving either of these contributions. In short, the Government's theory at trial was

---

7. In their briefs and at oral argument, the Government and the attorneys for Leach did not completely agree on the legal standard required by *Ashe* and its progeny. The Government contends that "this Court ... must determine what issues the jury necessarily must have resolved in the Appellant's favor ...." Brief at 20. Leach contends that this court should look to "what a rational jury might have done." Brief at 13. We are not sure that there is more than a semantic difference between these standards. If the Government means by its standard that we should ignore the record and merely look to whether there is any technically possible means by which the jury could have acquitted Leach without resolving the campaign–contribution issues in his favor, however, it is clearly misinterpreting *Ashe*.

8. The testimony of Ralph McRae, Jr. covers 828 pages of the transcript out of a total of 1,282 pages of transcript testimony.

9. The term "commercial vote" was used throughout the testimony to refer to the persons who allegedly would vote for the candidate for whom they were paid to vote.

10. Leach acknowledged that Ralph McRae, Sr. offered to contribute $4,000 in cash at the meeting, but he testified that he refused the money and urged that the contributions be made in the form of checks from McRae's family members. Transcript at 1176–79.

that Leach was involved in a comprehensive scheme to finance and arrange a vote–buying operation. The persons who testified about vote–buying also testified about the campaign contributions; the meetings they described frequently involved both campaign contributions and vote–buying discussions. Leach, through his own testimony and that of others,[11] flatly denied any involvement in any part of the scheme. The only way a rational jury could have acquitted Leach was by believing his testimony, and that of his other witnesses, over that of McRae and the other government witnesses.[12]

This case would be resolved differently if, for example, Leach had presented a defense that he thought the money he paid out was going for legitimate campaign expenditures rather than for vote buying. The jury might then have concluded that a conspiracy was going on without Leach's participation. Leach would then have been subject to prosecution on the campaign–contribution counts. Neither the Government nor the defense offered such a theory or anything similar, however. We cannot look at what might have taken place if the trial had been handled differently, but only at what did take place at trial. After examining the record most carefully and thoroughly, we can reasonably draw only one conclusion: that the jury decided that the Government had not proven Leach was involved in any part of the comprehensive scheme to finance and arrange for vote buying. The campaign–contribution allegations were an integral part of the scheme that the Government tried and failed to prove.

For the foregoing reasons, we vacate the order of the district court and direct the court to dismiss the superseding indictment.

VACATED AND REMANDED.

---

11. In addition to the defendants, the defense called four corroborating witnesses.

12. Of course, the jury may have believed the Government's case and still have acquitted Leach. Jury nullification–the right of a jury to acquit for whatever reasons even though the evidence supports a conviction–is an important part of the jury trial system guaranteed by the Constitution. In this case, it is not inconceivable that the jury might have been offended by the number of government witnesses who had been allowed to plead guilty to greatly reduced charges in return for their testimony, and might have felt it unfair to convict Leach in light of the lenient treatment received by the others. However, if we consider jury nullification as a basis on which the jury might have acquitted Leach without resolving the campaign–contribution issues in his favor, we would in effect be eliminating the entire doctrine of collateral estoppel and greatly weakening the protection against double jeopardy. *See* Westen & Drubel, *Toward a General Theory of Double Jeopardy*, 1978 Sup.Ct.Rev. 81, 122–55.