UNITED STATES of America

v.

Maurice BRYANT, et al.

No. 87–37(S)–Cr–J–TES.

United States District Court,
M.D. Florida,
Jacksonville Division.

Aug. 29, 1988.

See also 689 F.Supp. 1578.

John E. Steele and Stephen M. Kunz, Asst. U.S. Attys., Jacksonville, Fla., for U.S.

Brent Shore, Jacksonville, Fla., for defendant Bryant.

Robert S. Willis, Jacksonville, Fla., for defendant Mosley.

ORDER ON DEFENDANT BRYANT'S
COLLATERAL ESTOPPEL MOTIONS

SCOTT, District Judge.

This cause is before the Court on defendant Maurice Bryant's ("Bryant") Motion to Dismiss Counts XII through XIX as Prohibited by Double Jeopardy or Collateral Estoppel, filed herein on March 17, 1988, and defendant Bryant's Motion in Limine to Prohibit Introduction of Evidence on Collateral Estoppel Grounds, also filed herein on March 17, 1988. Defendant Bryant filed a supplement to the motion in limine on May 19, 1988, shortly after the trial transcript was made available. The government filed a consolidated response opposing said motions on May 24, 1988. Upon review of the memoranda of counsel, the trial transcript, the Court's instructions to the jury, and all relevant material of record, and upon consideration of the applicable law, the Court will grant defendant Bryant's Motion to Dismiss Counts XII through XIX, and will grant in part and deny in part defendant's Motion in Limine to Prohibit Introduction of Evidence on Collateral Estoppel Grounds. The opinion of the Court is set forth below.

## I. BACKGROUND [1]

### A. Procedural Chronology

Defendants Donald G. Gaffney ("Gaffney"),[2] Maurice Bryant ("Bryant"), and Samuel Mosley ("Mosley"), in an indictment filed on February 26, 1987, were charged with one count of conspiring to obstruct interstate commerce by extortion in violation of the Hobbs Act, 18 U.S.C. sec. 1951 (1982), various substantive counts of extortion, all in violation of the Hobbs Act, and eight counts of mail fraud, all in violation of 18 U.S.C. sec. 1341 (1982) ("First Indictment").[3] On June 25, 1987, the first day of trial, the Court granted defendants' ore tenus motion to dismiss the mail fraud counts pursuant to the holding of the United States Supreme Court in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).[4]

The jury was selected on June 25, 1987. Thereafter, on June 29, 1987, counsel for defendants and counsel for the government were afforded the opportunity to present opening statements, after which the presentation of evidence began. All testimony was concluded by July 16, 1987, and closing arguments were completed on July 20, 1987. Then, the Court charged the jury.[5]

---

1. Prior to undertaking the application of the doctrine of collateral estoppel, the Court recalls this vivid metaphor used by Judge Goldberg to describe the doctrines of double jeopardy and collateral estoppel:

 [T]he battles in these areas are pockmarked by assaults, retreats, and advances. In both fields we look for terrain that has been fought over, and cast our eyes about for tactical maneuvers in order to discover some grand design which really and in fact can fit the particular case before us for judgment and disposition.... We ... are thus hesitant to enter the field, but we shall do so bravely. And at analysis' end, we are confident that contemporary jurisprudence justifies our conclusion.

 *United States v. Larkin*, 605 F.2d 1360, 1361 (5th Cir.1979), *cert. denied*, 446 U.S. 939, 100 S.Ct. 2160, 64 L.Ed.2d 793 (1980).

2. Defendant Gaffney pleaded guilty to one count of extortion on August 4, 1988. He remains, however, a key player in this case because it was his position as a city councilman that gave rise to the alleged extortionate acts of the defendants. In other words, the "color of official right" which was allegedly used by defendants to exploit others was Gaffney's place on the city

council. His testimony at the first trial and the defense strategy he presented is intertwined with the defense theory of the other defendants and therefore, is relevant to this analysis.

3. With regard to the substantive charges of extortion, defendant Gaffney was named in fourteen counts, defendant Bryant in eleven counts, and defendant Mosley in three counts.

4. The Supreme Court in *McNally* held that the mail fraud statute (18 U.S.C. sec. 1341) does not prohibit schemes to defraud the citizenry of their intangible right to an honest and impartial government. This is the type of scheme the government had alleged in the First Indictment.

5. Included in the Court's instructions was a *Pinkerton* charge, which tells the jury that a conspirator can be vicariously liable for the crimes of a coconspirator if the crimes are committed during the course of, and in furtherance of the conspiracy, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy. *See Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed.2d 1489 (1946). The government, however, did not rely solely upon the theory of vicarious liability on any of

Jury deliberations began on July 20, 1987, and continued through July 24, 1987.[6]

During deliberations, on July 21, 1987, the jury foreman sent a message to the Court that one juror needed to be replaced because she had already made up her mind and would not discuss the case with the other jurors. The Court, after conferring with counsel, reinstructed the jurors with regard to their duty to deliberate and reminded them that any verdict or verdicts they might reach had to be unanimous. The next day, July 22, 1987, the jury foreman informed the Court, by way of note, that the jury was deadlocked, and he doubted they would be able to reach a verdict on any of the counts. Thereafter, the Court gave the jury a modified *Allen* charge.[7]

The jury continued to deliberate and on July 24, 1987, reached verdicts as to thirteen of the fifteen counts charged against defendant Gaffney, and reached verdicts as to all counts charged against defendants Bryant and Mosley. The jury found defendant Gaffney guilty of three counts, acquitted him of ten counts, and was unable to reach verdicts on two counts. Defendant Bryant was found guilty of five counts and was acquitted of six counts.[8] Defendant Mosley was convicted of three counts and acquitted of one count. Each

juror was polled individually and acknowledged his or her verdicts.[9]

Immediately after rendering their verdicts, three jurors made statements to the media, suggesting that extrinsic information had made its way into the jury room during trial and deliberations.[10] Additionally, one juror telephoned Robert J. Link, Esquire, co-counsel for defendant Gaffney, and corroborated that some of the jurors had in fact read and watched news accounts of the trial. Based on these statements, each defendant filed a post-trial motion to interview the jurors. The government filed a memorandum in opposition thereto. On August 19, 1987, the Court heard arguments on the motions. The Court decided that in the interest of justice the extraordinary measure of interviewing the jurors was necessary. The interviews were scheduled for September 10, 1987.

On December 18, 1988, the Court granted defendants' motions for new trial, finding that juror misconduct had tainted the guilty verdicts. *See United States v. Gaffney*, 676 F.Supp. 1544 (M.D.Fla.1987). The Court vacated the guilty verdicts and scheduled a new trial for February 16, 1988. On January 21, 1988, the grand jury returned a superseding indictment, charg-

the counts. Rather, the government asserted that defendants were guilty of the charged crimes under the *Pinkerton* theory and upon a theory that each defendant was liable based on his individual acts.

**6.** The trial of these defendants generated a great deal of publicity. The proceedings were reported daily in newspapers and on television and radio stations. The publicity was a result of defendant Gaffney's standing in the community and the fact that the crimes charged in the Indictment were alleged to have been committed while defendant Gaffney served as a Jacksonville City Councilman. Defendant Gaffney is a well-known public figure in Jacksonville, having been a football standout in high school and college, having served on the city council from 1983 to 1985, and serving as a member of the state legislature until he resigned from office earlier this year following his conviction on mail fraud charges. *See United States v. Gaffney*, 689 F.Supp. 1580 (M.D.Fla.1988).

**7.** *See Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed.2d 528 (1896); *see also* Pat-

tern Jury Instructions, United States Eleventh Circuit, at p. 19, No. 6.

**8.** Earlier the Court had granted defendant Bryant's motion for judgment of acquittal as to Count Six.

**9.** Specifically, defendant Gaffney was convicted on Counts One, Eight, and Eleven and found not guilty as to Counts Two through Seven, Nine, Ten, Fourteen, and Fifteen. The jury was undecided on Counts Twelve and Thirteen. Defendant Bryant was found guilty on Counts One, Four, Eight, Eleven, and Thirteen and was acquitted on Counts Two, Three, Five, Seven, Nine, and Twelve. Defendant Mosley was convicted on Counts One, Ten, and Eleven and was acquitted on Count Nine.

**10.** One juror made the following statement to the media:

I do not think it was fair the way they went about deliberating and stuff. They did not follow the Judge's rules. They even read newspapers and stuff like that concerning the trial and everything—and they're going to

ing defendants with the crimes upon which they had been convicted in the first trial, and with other Hobbs Act violations based upon newly discovered evidence.[11] Defendant Bryant was charged with conspiring to violate the Hobbs Act in Count One, and with substantive extortionate acts in Counts Two, Three, Four, Five, Six, Seven, Nine, and Eleven through Nineteen.

Defendant Bryant moves to dismiss Counts Twelve through Nineteen, arguing that the crimes charged in those counts were effectively litigated and decided against the government at the first trial. In the First Indictment, defendants Gaffney and Bryant were charged in Counts Two and Three with attempting to extort monies from the City of Jacksonville to Five Star Enterprises, Inc., a company owned by Bryant. Each count was based upon a separate contract entered into by the city and Five Star Enterprises. Counts Twelve through Nineteen of the superseding indictment make similar allegations, but the charges are based on different contracts than those in the First Indictment. Bryant also seeks to prohibit the introduction of evidence related in any way to the counts upon which the jury returned verdicts of not guilty (Counts Two, Three, Five, Seven, Nine, and Twelve of the First Indictment).[12] To resolve the issues presented by defendant Bryant, the Court must review, among other things, the theory of prosecution, the theory of defense, and the evidence presented at trial.

## B. 1987 Trial

In Count One of the First Indictment, defendants were charged with conspiring to violate the Hobbs Act by agreeing to obtain monies, property, and other things of value under color of official right and use of actual and threatened fear of financial or economic injury. More specifically, defendants were charged with conspiring or agreeing to use Gaffney's position as a member of the city council to extort monies and other things of value from persons who had business before the city council or the planning commission, and to extort monies from the city itself. In the substantive counts, defendants were charged with various acts of extortion and attempted extortion. The government's theory was that acts of extortion, were the product of a single conspiracy to use Gaffney's office to gain money and other favors from innocent victims. The actions taken by defendants to carry out the conspiracy formed the factual bases of the substantive counts.

A more detailed discussion of the evidence presented by the government is forthcoming in the Discussion Section of this Order. At this point, it is sufficient to present in general terms the respective theories of the prosecution and the defense.[13] The government presented evidence to show that defendant, as a member of the city council, took various actions on behalf of certain individuals on specific matters that these individuals had before the city council or the planning commission. The

---

come in and tell us what they knew on the case that we don't know.

11. Defendant Gaffney was also reindicted for the two counts upon which the jury had been unable to reach verdicts.

12. While Bryant states in his motion of March 17, 1988, that he seeks to preclude the government from offering evidence of the crime charged in Count Twelve of the First Indictment, he makes no reference to this evidence in his supplemental memorandum.

13. In a sense, the prosecution of the substantive charges can be viewed as a series of mini-trials which involved wholly separate factual underpinnings. The following breakdown is helpful:

Counts Two and Three Attempted extortion from city to Five Star Enterprises (fencing contracts)

Counts Four and Five Extorting monies from Carl E. Stoudemire and E. David Burner (zoning matters)

Counts Six and Seven Extorting monies and other things of value from John J. Reaves (zoning and variance matters)

Count Eight Attempted extortion from various individuals (approval of sketch plan for Ribault subdivision)

Counts Nine, Ten and Eleven Extorting monies from James Dixson, J & B Diesel, Thomas L. Markham and M & L Transport (zoning matter)

Counts Twelve, Thirteen Fourteen Extorting monies from Robert McKinley, Naegle Outdoor Advertising Inc., Charles Thompson, and Atlantic Outdoor Advertising, Co., Inc. (proposed sign ordinance, 85-1598A)

Count Fifteen Bruce Lingerfelt, Holmes Lumber Co., and D.W. Construction Co. (forbearance from collection of debt)

general blueprint of the government's case can be summarized as follows:[14] The government would offer evidence that defendant Gaffney introduced a certain ordinance to change the zoning classification of a certain parcel of property, or voted for a specific ordinance. Then, the government would call as a witness the person who allegedly benefited from Gaffney's official action. The witness would testify that defendant Gaffney, or defendants Mosley and Bryant on behalf of Gaffney, extorted something of value, usually money, from him in relation to Gaffney's official action.

Evidence presented to prove some counts showed that the monies were allegedly extorted by exploitation of the victim's fear that if he failed to pay certain monies or give business to Bryant's company, Gaffney would not "help" the victim. Other evidence showed that alleged victims were the recipients of more direct threats. Additionally, the government offered evidence to demonstrate that Gaffney subtly pressured city officials to recommend Bryant's company for city fencing projects.

The essence of the defense employed, both on cross examination and through the direct testimony of Gaffney and other defense witnesses, was twofold: first, that Gaffney's official action on various matters before the city council or the planning commission, and his informal action on behalf of Bryant's company, Five Star Enterprises, were ordinary, lawful, and nothing more than a city councilman vigorously fighting for the constituents of his district; and second, that if any wrongdoing occurred, it was done by the so-called victims of the alleged extortionate acts, not by the defendants.[15]

## II. DISCUSSION

### A. The Doctrine of Collateral Estoppel

The starting point for any discussion of the doctrine of collateral estoppel is the opinion handed down by the Supreme Court in *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). In *Ashe*, the Supreme Court held that the principles of collateral estoppel are incorporated in the double jeopardy clause, and therefore "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe*, 397 U.S. at 443, 90 S.Ct. at 1194. According to the Supreme Court:

[T]he rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of the prior proceeding, taking into account the pleadings, evidence, charge and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings."

*Id.* at 443–44, 90 S.Ct. at 1194 (citations and footnotes omitted).

The Eleventh Circuit Court of Appeals has construed *Ashe* to require a two-part inquiry: first, the Court must identify the facts the jury necessarily determined in reaching its verdict in the first trial; second, the Court must decide whether in the second trial the government will try to relitigate the issues "necessarily established against it in the first trial." *United States v. Mock*, 604 F.2d 341, 343 (5th

---

**14.** This is a composite summary and does not reflect the government's theory as to any particular count.

**15.** The Court recognizes that this is a general rendition of the defense strategy. Also central to defendants' case were efforts to show that many of the key witnesses, especially several of the alleged victims, testified to escape prosecution. In this connection, the defense suggested that the State Attorney's Office orchestrated some of the transactions which lead to alleged illegal conduct by defendants. Finally, the Court notes that the defense on some occasions implied that witnesses were racially prejudiced.

Cir.1979); [16] *see United States v. Whitaker*, 702 F.2d 901, 903 (11th Cir.1983). "Facts so established in the first trial may not be used in the second trial either as ultimate or as evidentiary facts." *Mock*, 604 F.2d at 343.

■ Collateral estoppel may act as a complete bar to a subsequent prosecution, or it may serve to bar the introduction or argumentation of certain facts. *United States v. Mulherin*, 710 F.2d 731, 740 (11th Cir.), *cert. denied*, 464 U.S. 964, 104 S.Ct. 402, 78 L.Ed.2d 343 (1983), *cert. denied*, 465 U.S. 1034, 104 S.Ct. 1305, 79 L.Ed.2d 703 (1984). Guidance with regard to the application of collateral estoppel as a complete bar to prosecution is found in the recent Eleventh Circuit decision in *United States v. Bennett*, 836 F.2d 1314, 1316 (11th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 2847, 101 L.Ed.2d 884 (1988) (citations omitted):

> To bar prosecution, a finding of fact must be inconsistent with a finding of guilt in a second trial. This determination requires a practical and realistic assessment of what makes the jury verdict coherent.

With these principles in mind, the Court first turns to the question whether the government is completely barred from prosecuting defendant Bryant on the charges contained in Counts Twelve through Nineteen of the Second Indictment. Then, the Court will determine whether the government should be prohibited from offering evidence related to the counts upon which defendant Bryant was found not guilty in the first trial.

### B. Motion to Dismiss Counts Twelve through Nineteen

■ In Counts Two and Three of the First Indictment defendants Gaffney and Bryant were charged with attempting to extort monies from the City of Jacksonville by gaining contracts for fencing projects without complying with bid requirements. The jury returned not guilty verdicts on both counts. In the Second Indictment, defendants are similarly charged, but different contracts form the bases of the charges.[17] Defendant Bryant contends that the government should be barred from prosecuting him on these counts because during the first trial the government presented evidence of each contract contained in the crimes charged in the Second Indictment. According to Bryant, the import of the not guilty verdicts in the first trial is that the jury necessarily determined that all contractual agreements between Five Star Enterprises and the City of Jacksonville were entered into lawfully, and were not the result of extortion. This Court agrees.

The issue presented by defendant Bryant can be framed as follows: Whether the jury in the first trial rationally could have acquitted him of the charges related to the city contracts with Five Star Enterprises without determining in his favor the issues critical to the seven charges related to city contracts contained in the Second Indictment. To resolve this issue, the Court first turns to the factual underpinnings of *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

In *Ashe*, the defendant was tried and found not guilty on a charge of armed robbery of one of six participants in a poker game. Defendant was then tried and convicted for the robbery of another of the poker players. The Court found that the conviction was barred by collateral estoppel, stating that "[t]he single rationally conceivable issue in dispute before the jury [in the first case] was whether the petitioner had been one of the robbers. And the jury by its verdict found that he had not." *Id.* at 445, 90 S.Ct. at 1194.

Further guidance on this issue is found in *United States v. Leach*, 632 F.2d 1337 (5th Cir. Unit A 1980). In *Leach*, the de-

---

**16.** *See Bonner v. Prichard*, 661 F.2d 1206 (11th Cir.1981) (Fifth Circuit Court of Appeals' decisions made prior to the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit).

**17.** That defendants were charged in the First Indictment with attempted extortion and are charged with extortion in the Second Indictment is not significant in light of the respective theories of the government and the defense.

fendant, a United States Congressman, was tried before a jury and found not guilty of several counts of vote buying. Thereafter, he was tried for receiving illegal campaign contributions. The Fifth Circuit determined that the campaign contribution charges were an integral part of the comprehensive scheme to finance and arrange for vote buying. Since the government failed to prove defendant was guilty of vote buying, it was barred from relitigating the same facts with regard to the campaign contribution charges.

Like the factual scenarios in *Ashe* and *Leach,* the city contract counts in the First Indictment arise out of the same general scheme as the city contract counts charged in the Second Indictment. While the doctrine of collateral estoppel must be applied to the specific facts of this case, *Ashe* and *Leach* provide a blueprint for analyzing the jury verdicts on the city contract counts to determine whether the jury necessarily decided certain facts against the government, thus prohibiting the government from proceeding against defendants on charges founded upon different city contracts.

The government's theory of prosecution was that defendants Gaffney, Bryant, and government witness Stanley Williams formed a sham corporation, Five Star Enterprises, Inc. According to the evidence presented by the government, the plan was for defendant Gaffney to direct business to Five Star Enterprises through minority set aside programs with the City of Jacksonville, and in return, he received kickbacks in the form of cash payments from Maurice Bryant and Five Star Enterprises.

To prove its theory, the government relied chiefly upon the testimony of Stanley Williams. Williams testified that Five Star Enterprises was created so that Gaffney would have a means to funnel business to Bryant, who in turn would compensate Gaffney. Trial Transcript, (T.T.) vol. 10, p. 54–56. Williams testified that Gaffney received most of the money from the city contracts and always received it in cash. T.T., vol. 10, at p. 56. Williams did not testify with respect to specific contracts, but rather discussed the scheme as a whole.

The government introduced the following evidence to show that Bryant made payments to Gaffney as part of this plan: records of Gaffney's personal checking account showing a number of cash deposits, *see* Testimony of George Albert Bray, T.T., vol. 1, pp. 44–46 and Exhibit 59A–N; records of Gaffney's personal savings account, *see* Testimony of Victor R. Saathof, T.T., vol. 1, pp. 67–75 and Exhibit 60; and records of the checking account of Five Star Enterprises, *see* Testimony of John Avery, vol. 1, pp. 76–78 and Exhibit 61A–E (offered to prove that large sums of money had been withdrawn from the account in the form of checks made out to cash or checks made out to Maurice Bryant).

The government also called several city employees as witnesses to demonstrate various actions taken by Gaffney and Bryant on behalf of Five Star Enterprises. John Mosley, who works in the Parks and Recreation Department, testified that Gaffney asked him to recommend Five Star Enterprises as a suggested vendor for fencing projects. Through him the government introduced records pertaining to each of the city contracts described in Counts Two and Three of the First Indictment, and Counts Twelve through Nineteen of the Second Indictment. *See* T.T., vol. 4, pp. 126–65. Ron Watson, who was the acting Deputy Director for Parks and Recreation, regularly was asked by Gaffney whether there was any work Bryant could do for the Parks and Recreation Department. *See* T.T., vol. 5, pp. 23–24. He testified that he began using Five Star Enterprises as a suggested vendor based upon Gaffney's request. *See* T.T., vol. 5, pp. 24. Connell Heyward, coordinator for the City of Jacksonville minority set aside program, testified that in May 1985, Gaffney and Bryant came to his office and placed Five Star Enterprises on the minority set aside bidder's list. He stated that Gaffney filled out the necessary paperwork for Five Star Enterprises. *See* T.T., vol. 6, at pp. 46–47. Dan Haskell, the Chief Purchasing Officer for the City of Jacksonville, testified about the minority set aside program and how

Five Star Enterprises obtained contracts with the city. *See* T.T., vol. 5, pp. 56–79.[18]

Other evidence presented by the government to demonstrate that Five Star Enterprises was a sham corporation and to prove that contracts between Five Star Enterprises and the city were obtained through the extortionate acts of Gaffney and Bryant included the testimony of the owner of G & B Fence Company, Malachi Beyah. He testified that his company entered into subcontract with Bryant to do the work for Five Star Enterprises on projects described in Count Two of the First Indictment and Counts Twelve, Thirteen, Fourteen, and Seventeen of the Second Indictment. *See* T.T., vol. 5, pp. 134–35; 142–44.[19]

The theory of the defense, evident during the cross examination of government witnesses, and presented directly by the testimony of defendant Gaffney and employees of Five Star Enterprises was singular and applicable to all government contracts entered into by Five Star Enterprises and the City of Jacksonville: Five Star Enterprises was a legitimate fencing company that lawfully received city contracts. Defendant Gaffney testified at length about his relationship with Five Star Enterprises and about the contracts between Five Star Enterprises and the City of Jacksonville. *See* T.T., vol. 10, pp. 35–38. He acknowledged that he had asked the Parks and Recreation Department to recommend Five Star as a suggested vendor. But he said he did so because he wanted to help his friend Bryant. He denied using any improper influence to obtain these contracts for Five Star and denied receiving any benefits from Five Star.[20]

The only rational explanation for the verdicts of acquittal on the city contract counts is that the jury believed Gaffney's testimony and that of other defense witnesses. In light of (1) the massive amount of circumstantial evidence presented by the government, and (2) the direct testimony of city employees that Gaffney frequently recommended Five Star for fencing projects, the jury by choosing Gaffney's version of the events, necessarily determined that Gaffney did not attempt to use his official position knowingly and willfully to obtain city contracts for Five Star Enterprises, and further determined that Five Star Enterprises was not a sham corporation. *See Mock,* 604 F.2d at 343. No other explanation makes the jury verdict on these counts cohere. *See Bennett,* 836 F.2d at 1316.[21] The prosecution's case was presented as a single package, as was the defense. The city contracts which underlie Counts Twelve through Nineteen were integral to the government's theory of prosecution.

The government contends that since Counts Twelve through Nineteen were not charged in the First Indictment, the jury's verdict did not necessarily determine any underlying facts as to the elements of the crimes alleged in these counts. This argument oversimplifies the evidence the government itself presented as to the city contracts. As noted above, the government's case included evidence of all the

---

**18.** If any doubt remains as to whether the government lumped all city contracts together as one grand scheme in trying Counts Two and Three, it is dispelled by Exhibit 87B. This exhibit is a chart listing all city contracts entered into by Five Star Enterprises and the city.

**19.** The government also offered the testimony of other persons in the fencing business to show that Five Star Enterprises was a sham corporation. *See* Testimony of Gary Vincent, T.T., vol. 5, pp. 184–87; Testimony of Jimmy Person, T.T., vol. 6, pp. 100–11.

**20.** This testimony was directed to all contracts with the city, including those presented in Counts Twelve through Nineteen of the Second Indictment.

**21.** While it could be argued that the jury did not necessarily find that Five Stars Enterprises was not a sham corporation, the Court rejects this possibility for the following reason. The circumstantial evidence demonstrated, and Gaffney admitted, that he was involved in the formation of Five Star Enterprises. He also testified that he recommended Five Star enterprises to city employees. Had the jury believed Williams' testimony that Five Star Enterprises was a sham from the beginning, the jury would have necessarily rejected Gaffney's testimony and would have convicted defendants. Any other conclusion simply would not make sense.

contracts the city had entered into with Five Star Enterprises. If the government were allowed to proceed with Counts Twelve through Nineteen at the second trial, it would no doubt rely on the same evidence presented at the first trial. Bryant defended against such charges in the first trial, and the jury returned not guilty verdicts, thus rejecting the government's single theory of prosecution.[22] Accordingly, the Court will dismiss Counts Twelve through Nineteen of the Second Indictment.

### C. Motion in Limine to Prohibit Introduction of Evidence on Collateral Estoppel Grounds

■ In his Motion in Limine to Prohibit Introduction of Evidence on Collateral Estoppel Grounds, defendant argues that the government should be precluded from offering evidence related to the counts in the First Indictment upon which the jury rendered verdicts of not guilty and the count upon which the Court granted a judgment of acquittal.[23] Consistent with case law, the Court will examine the record of the first trial, "taking into account the pleadings, evidence, charge, and other relevant material" to determine whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose." *Sealfon v. United States*, 332 U.S. 575, 579, 68 S.Ct. 237, 239, 92 L.Ed. 180 (1948).

### 1. Counts Two and Three—City Contracts

■ In Section A above, the Court dismissed Counts Twelve through Nineteen of the Second Indictment, finding that the jury verdicts of not guilty on Counts Two and Three of the First Indictment necessarily determined that defendants Gaffney

and Bryant had not attempted to extort monies from the city and that Five Star Enterprises was not a sham corporation. In so doing, the Court reviewed in some detail the evidence with respect to Counts Two and Three. To determine whether evidence related to contracts entered into by the City of Jacksonville and Five Star Enterprises should be completely barred, the Court turns its attention to the testimony of defendant Gaffney.

Defendant Gaffney did not deny that he was somewhat involved with Five Stars Enterprises. In fact, he admitted incorporating the business for Bryant and admitted assisting Bryant in obtaining business for Five Star Enterprises. *See* T.T., vol. 10, pp. 35–37. But, defendant Gaffney denied any wrongdoing in helping Bryant. In Section A above, the Court found that the jury necessarily determined that Gaffney did not knowingly and willingly attempt to extort money from the city to Five Star Enterprises, thus removing the "color of official right" element from the crime. Additionally, the Court decided that the jury must have determined that Five Star Enterprises was not a sham corporation. In light of defendant Gaffney's testimony that he incorporated Five Star Enterprises and that he helped Bryant get business for Five Star Enterprises, a total bar of all evidence related to the city contract counts would be too broad an application of the doctrine of collateral estoppel. To the extent that Gaffney's relationship with Five Star Enterprises and Bryant is relevant to the alleged conspiracy charged in Count One of the Second Indictment, evidence of such relationship is not barred. The government is prohibited, however, from introducing any evidence tending to show that Gaffney and Bryant intended to attempt to commit extortionate acts related to city

---

**22.** It is possible that the jury may have believed the government's case, but acquitted defendants nevertheless. "[T]he right of a jury to acquit for whatever reasons even though the evidence supports a conviction is an important part of the jury trial system guaranteed by the Constitution." *Leach*, 632 F.2d at 1341 n. 12. If jury nullification, however, is used as a basis on which the jury resolved this issue in favor of the defendants, the Court would be in effect abol-

ishing the entire doctrine of collateral estoppel. *See id.* (citation omitted).

**23.** In applying the principles of collateral estoppel, it makes no difference that the Court, rather than the jury, acquitted defendant. *See United States v. Mock*, 604 F.2d 341, 343 n. 2 (5th Cir.1979) (citing *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed. 2d 642 (1977)).

contracts and is further precluded from suggesting or arguing in any manner that Gaffney and Bryant possessed such intent. Any evidence with regard to city contracts will be closely scrutinized to determine if it is relevant and otherwise admissible under the Federal Rules of Evidence.

### 2. Counts Four and Five—Stoudemire and Burner

■ Counts Four and Five of the First Indictment charged defendants Gaffney and Bryant with extorting money from Carl E. Stoudemire ("Stoudemire") and E. Davis Burner ("Burner"). The extortion of $3,278 charged in Count Four involved the alleged wrongful use of Gaffney's office as a city councilman to obtain the rezoning of approximately 100 acres of real property located between Interstate 295 and U.S. 1, in Duval County, Florida. The charge brought in Count Five also involved the alleged wrongful use of Gaffney's office to extort $5,000.00 in connection with the same property. The jury found defendant Gaffney not guilty of the crimes charged in Counts Four and Five. Defendant Bryant was convicted on Count Four and acquitted on Count Five. Defendant Bryant asks the Court to effectively dismiss Count Two (Count Four of the First Indictment) because the "color of official right" element in that count has been removed by the acquittal of Gaffney. Bryant also seeks to preclude any evidence related to the crime charged in Count Five, upon which he was found not guilty.[24]

■ As to Count Two of the Second Indictment, the Court finds merit in Bryant's argument. A private citizen can neither extort money "under color of official right" nor can he or she extort money by actual or threatened fear of economic loss unless there is complicity of a public official. *See, e.g., United States v. Gonzales,* 620 F.Supp. 1143 (N.D.Ill.1985). The interplay of two factors leads to the conclusion that the government has effectively charged defendant Bryant alone of violating the

Hobbs Act in Count Two of the superseding indictment. First, the jury was given the substantive charge with regard to a Hobbs Act violation and the so-called "Pinkerton" instruction, which holds each coconspirator criminally liable for the acts of all coconspirators committed in furtherance of the conspiracy. *See Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed.2d 1489 (1946). Second, defendants Gaffney and Bryant were found guilty of conspiracy, but defendant Gaffney was found not guilty as to Count Four in the original indictment (Count Two of Second Indictment). Necessarily implicit in the jury's finding therefore is that defendant Gaffney was not involved in the substantive count and further, that this alleged substantive act was not part of the larger conspiracy. *See Ashe v. Swenson,* 397 U.S. 436, 443–44, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970). It follows that without defendant Gaffney's collusion, the fear of actual or threatened economic loss or injury based on the complicity of a public officer disappears. Accordingly, Count Two of the Second Indictment will be dismissed.

■ The dismissal of Count Two does not preclude the presentation of evidence with respect to actions of defendant Bryant which form the basis of the crime charged. While the Court will dismiss Count Two because an essential element of the crime has been eliminated, the doctrine of collateral estoppel does not prohibit the government from presenting evidence which serves as the foundation of the crime charged therein to prove remaining counts, as long as such evidence otherwise comports with the Federal Rules of Evidence.

As noted above, both Gaffney and Bryant were found not guilty of the crime charged in Count Five. To determine what issues, if any, were necessarily decided by the jury in rendering the not guilty verdicts, the Court must review the evidence presented by the government and the defense.

---

24. Bryant did not file a motion to dismiss directed toward Count Two of the Second Indictment (former Count Four). His request that the prosecution be prevented from pursuing this count is found in Bryant's supplement to his motion in limine, filed herein on May 19, 1988.

The government offered the testimony of Ron Johnson, secretary to the city council, who explained "normal" procedures for filing rezoning applications or petitions. *See* T.T., vol. 1, pp. 9–12. Johnson testified that on occasion a city councilman might file a zoning application on behalf of a citizen, although usually private citizens filed their own. T.T., vol. 1, pp. 9–11. Through Johnson, the government introduced three zoning ordinances into evidence (Exhibits 32, 33, and 34) pertaining to property owned by Burner and Stoudemire. *See* T.T., vol. 1, pp. 22–23.

Burner testified that he alone, or he and Stoudemire met with Gaffney and Bryant on more than one occasion to discuss the rezoning of property. He related the events of one meeting at which Gaffney asked him and Stoudemire for a loan of $5,000.00. T.T., vol. 3, p. 165. Burner further testified that Bryant asked him if he (Burner) would sell him (Bryant) some property. T.T., vol. 3, p. 168. Stoudemire stated that at one point Gaffney suggested that a constituent from District Ten should "get involved" in the development of the tract of land that Gaffney was helping to get rezoned. The person he recommended to Stoudemire was Bryant. Thereafter, according to Burner, he and Stoudemire sold a section of the parcel of property to Bryant, contingent upon the successful rezoning of the entire parcel. Burner stated, "[h]e (Bryant) paid $100.00 down and the property was to be rezoned."[25] T.T., vol. 3, p. 170.[26] If the rezoning fell through, the contract could be withdrawn by either party. Burner testified that he "felt like we needed to sell [the property] to [Bryant] or we wouldn't get it rezoned." T.T., vol. 4, p. 171.[27]

Gaffney introduced an ordinance to have the subject parcel of property rezoned. T.T., vol. 3, p. 243. Since Gaffney introduced the ordinance himself, Stoudemire and Burner did not have to follow the standard procedure for requesting a zoning change. Stoudemire told the jury that he and Burner decided to have Gaffney withdraw the ordinance, because they "wanted to go the usual route." T.T., vol. 3, p. 244. Thereafter, Stoudemire paid Bryant $1,000.00 to refile the zoning ordinance through the regular channel. T.T., vol. 3, p. 246.[28] After certain complaints were made about the rezoning of the property, Stoudemire and Burner decided to again withdraw the ordinance and further decided not to pursue the rezoning of the property. T.T., vol. 3, p. 247.

The withdrawal of the ordinance triggered the condition in Bryant's contract to purchase the ten acres of property. Accordingly, Stoudemire mailed a check for $100.00, the amount of the binder, to Bryant. T.T., vol. 3, p. 247. A short time later, Bryant met with Stoudemire to discuss the property deal. Stoudemire testified that Bryant said the $100.00 refund was insufficient. T.T., vol. 3, p. 249. Bryant wanted $10,000.00. Eventually, defendant Gaffney became involved in the negotiations, telling Stoudemire at one point that $10,000.00 was a fair amount to pay Bryant to release him and Burner from the contract. T.T., vol. 4, p. 4.

Stoudemire decided to pay Bryant $5,000.00 to obtain a release from the contract, and he wrote Bryant a check for that amount. T.T., vol. 4, pp. 1–5. He said he would not have given Bryant that much money if it were not for the fact that Gaffney was a city councilman. T.T., vol. 4, p. 6.

The testimony of Burner and Stoudemire highlighted above offers a flavor of the dealings that went on among Stoudemire, Burner, and defendants Gaffney and Bryant. These excerpts make clear that

---

**25.** Stoudemire testified that he and Burner sold about ten acres of property to Bryant for $40,000.00. Bryant gave them a $100.00 binder and planned to give them an additional $900.00 at the closing.

**26.** *See also* Testimony of Carl Stoudemire, T.T., vol. 3, pp. 23–39.

**27.** *See also* Testimony of Stoudemire, T.T., vol. 3, p. 242.

**28.** Stoudemire and Burner had hired Bryant to petition for the rezoning. They paid him various sums of money in conjunction with the rezoning on more than one occasion.

the government's theory of prosecution of Counts Four and Five was that Gaffney and Bryant exploited Burner and Stoudemire's fear that if they did not "cooperate," their property would not be rezoned. Further, the government tried to show that Burner and Stoudemire harbored a fear that failure to go along with Gaffney and Bryant might antagonize defendant Gaffney.[29]

On cross examination, the defense suggested that Burner and Stoudemire had been in the real estate business for years and were quite familiar with sophisticated zoning matters, T.T., vol. 4, p. 17. Moreover, the defense elicited testimony which portrayed the dealings they had with Gaffney and Bryant as "ordinary," in the business sense. The defense attempted to demonstrate that the ten acre tract of land purchased by Bryant was unrelated to Gaffney's stance on zoning matters, and that any money given to Bryant was part of a legitimate business transactions to obtain rezoning of property (Count Four) or purchase real estate (Count Five). T.T., vol. 4, pp. 30–38.[30]

Gaffney testified that Burner and Stoudemire approached him about the possible rezoning of a certain parcel of property for the purpose of building an office complex. T.T., vol. 10, p. 107. Gaffney stated that this excited him because it was an excellent project for his district. Gaffney did not deny meeting with Stoudemire and Burner on different occasions, and in fact, on one occasion, to learn more about the proposal, Gaffney visited the property. He admitted taking action to obtain the rezoning of the property, but he said it was not for his own benefit; it was to help create jobs in his district. T.T., vol. 10, p. 110–12. With regard to the parcel of property purchased by Bryant from Stoudemire and Burner and the $5,000.00 paid to Bryant to cancel the contract, Gaffney admitted that he talked to Stoudemire about the situation, but he testified that he did so as a private citizen, not as a city councilman. He further testified that the business between Bryant and Stoudemire was completely unrelated to his position as a city councilman.

In summary, the strategy of the defense was to paint a picture of a city councilman fighting for his district by lawfully taking official positions which would enhance his district's economic growth and development. Moreover, the defense portrayed Gaffney as a man who helped and supported his friends, but knew how to draw the line between personal matters and city business.

■ To acquit defendants of the crime charged in Count Five, the jury had to believe Gaffney's testimony about Stoudemire's $5,000.00 payment to Bryant and reject Stoudemire's testimony that the money was paid because of Gaffney's position as a city councilman, and the fear that failure to pay Bryant a hefty sum would antagonize Gaffney. In other words, the jury necessarily found that Gaffney and Bryant did not willfully and knowingly commit extortion in gaining the $5,000.00 payment, but rather received that sum as a result of tough, honest business negotiations.

The defense did not dispute that Bryant entered into a contract to purchase real property and that Bryant received a $5,000.00 payment from Stoudemire and Burner in exchange for signing a release from the real estate contract; therefore, the Court will allow testimony of these transactions, including evidence about Gaffney's participation, but only to the extent such evidence is relevant to the conspiracy charge. The Court will not, however, permit the government to suggest through the introduction of evidence or the argument of counsel that Gaffney and Bryant knowingly and willfully extorted $5,000.00 from Stoudemire and Burner.

---

29. Stoudemire, discussing why he paid Bryant the sum of $5,000.00, said, "In this particular case, it was such a large sum and Don [Gaffney] being a politician, we felt, or I felt that it was—I really couldn't afford to antagonize anybody."

30. On cross examination, the defense attempted to suggest that Stoudemire and Burner were concerned that they in fact may have violated the law in handling the rezoning matters.

### 3. Counts Six and Seven—Reaves

In Counts Six and Seven of the First Indictment, defendants Gaffney and Bryant were charged with extorting monies and other things of value from John J. Reaves and Southeastern Roofing and Sheet Metal, Inc. Count Six charges Gaffney and Bryant with allegedly obtaining a new roof for the residence of Gaffney's mother through extortion in relation to the rezoning of and variance for approximately five acres of real property owned by Reaves. Count Seven charged defendants with extorting $1,500.00 in connection with the same property. The Court granted defendant Bryant's motion for judgment of acquittal on Count Six after the close of the government's case-in-chief. The jury found Gaffney not guilty as to Count Six. Both defendants were acquitted of the crime charged in Count Seven.

The Court granted Bryant's judgment of acquittal on Count Six because the record was totally devoid of evidence connecting Bryant to the alleged extortion. The Court necessarily determined that Bryant had no involvement with respect to the crime charged in Count Six; therefore, the government will be barred from presenting evidence of the crime charged in that count at the second trial.

To prove the crime charged in Count Seven, the government relied mainly upon the testimony of John J. Reaves, the alleged victim of the extortion. *See generally* T.T., vol. 1, p. 91 through vol. 2, p. 30.[31] Reaves testified he feared that Gaffney would withdraw support for the various zoning changes if he (Reaves) did not do business with Bryant and did not donate to Gaffney's campaign for the State House of Representatives. T.T., vol. 2, p. 29. The government attempted to show that although Gaffney and Bryant never directly threatened Reaves, they exploited his apprehension over the zoning matters. T.T., vol. 2, p. 29.

As in its defense of other charges, defendants tried to show on cross examination that Reaves had previous experience with zoning matters. The suggestion was that Reaves was not an innocent victim of defendants' extortionate acts. Defense counsel elicited responses from Reaves tending to show that he freely and voluntarily used Bryant's fencing company and gave money to Gaffney's campaign without coercion.

Gaffney did not deny meeting with Reaves and working on his behalf. *See generally* T.T., vol. 10, pp. 41–65. He felt that helping Reaves would translate into economic development for district ten. Gaffney testified that he met with a community association to discuss Reaves' proposed zoning change, evidencing his intent to do a good job for his district and rebutting evidence that he extorted money in connection with Reaves' property. T.T., vol. 10, pp. 44–45. The campaign contribution, according to Gaffney, was in no way connected to Reaves' rezoning and variance matters.

After hearing testimony best described as a classic swearing contest between Gaffney and Reaves, the jury believed Gaffney's testimony that he and Bryant did not knowingly and willfully use Gaffney's office to gain monies and other things of value from Reaves. That is, the jury necessarily determined that they lacked the requisite intent to commit extortion. Since Gaffney admitted that the meetings with Reaves took place, and that he helped Reaves with zoning and variance matters, the evidence related to these matters is not barred in its entirety. But, as with other evidence discussed above, the government will be limited to presenting such evidence as it relates to the conspiracy and otherwise comports with the Federal Rules of Evidence. The government will not be allowed to present evidence of criminal intent with regard to these actions, nor will it be allowed to argue such intent to the jury.

### 4. Count Nine—Markham

All three defendants were charged in Counts Nine and Eleven with extorting

---

**31.** Ron Johnson, secretary to the city council, and other city employees testified to the facts surrounding official action taken by Gaffney on the rezoning of Reaves' property.

monies and other things of value from Thomas L. Markham and M & L Transportation Brokers, Inc. Defendants were found guilty of the crime charged in Count Eleven; therefore, there is no attempt to bar evidence of that crime in the second trial. The acquittal of all three defendants of the charge contained in Count Nine gives rise to defendant Bryant's request that evidence related to that count be precluded at the second trial.

The extortionate acts alleged in Counts Nine and Eleven of the First Indictment were related to Markham's desire to obtain the rezoning of 10.9 acres of real property located at the intersection of Picketville Road and Old Kings Road, in Jacksonville. In Count Nine, defendants were charged with extorting a $350.00 campaign contribution. Count Eleven charged defendants with extorting $6,000.00 for the rezoning of the aforementioned tract of land. A review of the evidence demonstrates clearly that the factual underpinnings of the crimes charged in Counts Nine and Eleven are separate and distinct. While the same parcel of property served as the focal point of the charges, the different verdicts reached by the jury are neither irrational nor inconsistent.

Markham was the key witness in the government's presentation of allegations in Counts Nine and Eleven. He and defendant Mosley both worked for the same company. Markham testified that he became acquainted with Bryant and Gaffney through Mosley. T.T., vol. 7, p. 238–41. According to Markham, his relationship with Bryant and Gaffney was initiated by Mosley because Mosley told Markham that "he had friends that could help [him]" accomplish the rezoning of his property.

 As to the charge of extortion in Count Nine, Markham testified that Bryant, Gaffney, and Stanley Williams stopped by his office in July 1986, and asked him for a campaign contribution of $1,000.00. Markham balked at the amount but did eventually write out a check for $350.00. T.T., vol. 7, pp. 244–45. Markham recalled discussing the zoning of his property with Bryant at that meeting, but he could not recall whether Gaffney was present for the entire conversation. T.T., vol. 7, p. 46. When asked to explain the reason he made the $350.00 contribution, Markham replied, "Well, I thought it might be in my best interest being he was representing that district." T.T., vol. 7, p. 247.

Markham testified that in October 1986, he was contacted by the State Attorney's Office. As a result of a conversation he had with representatives of the State Attorney's Office, he agreed to cooperate in an investigation into the conduct of defendants.[32] Thereafter, he participated in telephone conversations with defendant Mosley for the purpose of recording the conversations. T.T., vol. 7, pp. 248–50. He also agreed to meet Bryant and Mosley at a restaurant and record conversations that took place. These conversations involved the rezoning of his parcel of property.

On cross examination, Markham stated that he continued to pursue the rezoning at the behest of the State Attorney's representatives. T.T., vol. 8, p. 76. As a result of his interaction with Mosley and Bryant, it was Markham's understanding that it would cost him $6000.00 and three acres of land to obtain the rezoning he desired. Markham further related that he met Gaffney, Bryant, and Mosley at a specific location to pay them the $6,000.00. He was wearing a body bug in order to record the conversation. The testimony of Markham about the payment of the money to defendants and the recorded conversations were a key ingredients in the guilty verdicts reached by the jury on Count Eleven.

Defendant Gaffney admitted that he went with Bryant and Stanley Williams to Markham's office in July 1986, where he received a campaign contribution. Gaffney stated that Markham knew he was stopping by to pick up the contribution, not to discuss zoning matters. Gaffney said he did not talk to Markham about zoning mat-

---

**32.** Markham admitted on cross examination that he did not go to the state attorney's office of his own volition. T.T., vol. 8, at 74.

ters at all during the visit. Consistent with his testimony about other charges, Gaffney stated that in his dealings with Markham, he was vigorously representing his constituents. He stated that the contribution he obtained from Markham was unrelated to the zoning matters. T.T., vol. 10, p. 157.

In finding defendants not guilty as to Count Nine, the jury necessarily concluded that the July 1986 trip to Markham's office, the collection of the campaign contribution, and other conduct related thereto were not extortionate acts on the part of defendants. The jury necessarily believed Gaffney that he, Bryant, and Mosley did not knowingly and willfully extort the $350.00 campaign contribution. Since Gaffney admitted going to Markham's office and admitted receiving the campaign contribution, evidence of these events are not barred by collateral estoppel. The government will be limited in its presentation of such evidence in that it will not be able to introduce such evidence to show criminal intent and will be precluded from arguing that the transactions evince criminal intent.

### III. CONCLUSION [33]

Consistent with the foregoing, it is

ORDERED AND ADJUDGED:

1. That defendant Bryant's Motion to Dismiss Counts XII through XIX is hereby granted;

2. That Counts Twelve through Nineteen of the Second Indictment are hereby dismissed;

3. That defendant Bryant's Motion to Prohibit Introduction of Evidence on Collateral Estoppel Grounds is hereby granted in part and denied in part as set forth in this Order; and

4. That Count Two of the Second Indictment is hereby dismissed.

---

[33.] As stated above, defendant has failed to carry its burden with respect to precluding evidence of the crime charged in count Twelve of the First Indictment, because he failed to set forth the facts he seeks to preclude. In *United States*

---

*v. Giarratano,* 622 F.2d 153, 156 n. 4 (5th Cir. 1980), the Court stated unequivocally that the defendant must precisely define those factual issues that were necessarily determined in the prior trial.