# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

### No. 99-41007

---

### UNITED STATES OF AMERICA

**Plaintiff-Appellee,**

**v.**

### RALPH NATHANIEL THOMPSON; TIMOTHY GARDELL WOOTEN; GERALD PHILLIP WOOTEN

**Defendants-Appellants,**

---

### Appeals from the United States District Court for the Eastern District of Texas
### (4:98-CR-64)

---

April 9, 2001

Before GOODWIN,[*] GARWOOD and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:[**]

      Defendant-Appellants Ralph Thompson, Timothy Wooten and Gerald Wooten were convicted on a variety of conspiracy and substantive offenses arising out of a multi-state cocaine distribution and money laundering enterprise that engaged in acts of violence, including murder, robbery, and obstruction of justice.

---

     [*]     Circuit Judge of the Ninth Circuit, sitting by designation.

     [**]     Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Appellants now assert multiple errors regarding sufficiency of the evidence, the verdict form, the jury charge, denials of motions for severance, the indictment, the constitutionality of 18 U.S.C. 922(g), a motion in limine regarding the closing argument, and sentencing.

After carefully reviewing the arguments and the record, the court finds that there is no merit to the appellants' complaints. We affirm.

## BACKGROUND

On August 12, 1998, the grand jury for the Eastern District of Texas named, among others, all three Defendant-Appellants in an eighteen count indictment. On October 15, 1998, Ralph Thompson and Gerald Wooten filed motions to sever. The district court denied severance on April 8, 1999. A second superseding 18 count indictment[1] was returned on March 11, 1999,

---

[1] The counts in the indictment are  follows: (1) RICO, 18 U.S.C. § 1962(c); (2) RICO conspiracy, 18 U.S.C. § 1962(d); (3) conspiracy to distribute cocaine, 21 U.S.C. § 846; (4) conspiracy to commit murder in aid of racketeering activity, 18 U.S.C. § 1959(a)(5); (5) interstate travel for murder for hire-victim Edgar Reece, Jr., 18 U.S.C. § 1958, and  aiding and abetting, 18 U.S.C. § 2; (6) interstate travel for murder for hire-victim Fasha Norman, 18 U.S.C. § 1958, and aiding and abetting, 18 U.S.C. § 2; (7) interstate travel for murder for hire-victim Harvey Lee Gabriel, 18 U.S.C. § 1958 and aiding and abetting, 18 U.S.C. § 2; (8) interstate travel for murder for hire-victim Keno Fletcher, 18 U.S.C. § 1958, and aiding and abetting, 18 U.S.C. § 2; (9) violent crime (murder) in aid of racketeering activity-victim Edgar Reece, Jr., 18 U.S.C. § 1959(a)(1); aiding and abetting, 18 U.S.C. § 2; (10) violent crime (murder) in aid of racketeering activity-victim Fasha Norman, 18 U.S.C. § 1959(a)(1), aiding and abetting, 18 U.S.C. § 2; (11) use or carrying a firearm during a crime of violence (murder), 18 U.S.C. § 924(c)(1), aiding and abetting, 18 U.S.C. § 2; (12) felony in possession of a firearm, 18 U.S.C. § 922(g) aiding and abetting, 18 U.S.C.  § 2; (13)  violent crime (assault with a dangerous weapon/assault causing bodily injury) in aid  of racketeering activity-victim Harvey Lee

again naming all three Defendant-Appellants. All three Appellants were tried by jury in a single proceeding in the Eastern District of Texas, Sherman Division. On May 21, 1999, all were convicted of various offenses related to their participation in the cocaine distribution and money laundering enterprise. Ralph Thompson was sentenced to life in prison. Timothy Wooten was sentenced to life in prison plus thirty-five years. Gerald Wooten was sentenced to 360 months on count three and 240 months on count seventeen, to be served concurrently. All three now appeal to this court, assigning various errors and claiming insufficiency of the evidence.

The Government alleged that the appellants were, to varying degrees, involved in "a multi-state cocaine distribution and money laundering enterprise . . . ." The enterprise shipped cocaine from California to Texas, Colorado, Kansas and Alabama using commercial carriers and drug couriers. The proceeds of the sales were funneled back to California using the mails, couriers and Western Union. The enterprise used violence to maintain discipline and silence.

---

Gabriel, 18 U.S.C. § 1959(a)(3), aiding and abetting, 18 U.S.C. § 2; (14) violent crime (assault with a dangerous weapon) in aid of racketeering activity- victim Keno Fletcher, 18 U.S.C. § 1959(a)(3), aiding and abetting, 18 U.S.C. § 2; (15) using or carrying a silenced firearm during a crime of violence, 18 U.S.C. § 924(c)(1), aiding and abetting, 18 U.S.C. § 2; (16) Possession of an unregistered firearm (silencer), 18 U.S.C. § 5861(d); aiding and abetting, 18 U.S.C. § 2; (17) money laundering conspiracy, 18 U.S.C. § 1956(h); (18) obstruction of justice, 18 U.S.C. § 1503.

Mark Barney was the leader of the enterprise. Both his brother, Vincent Barney, and girlfriend, Kelley Sorbellini, were involved. All three were named in at least one count of the second superseding indictment. All made deals with the Government and testified at trial.

Ralph Thompson started out as a drug courier but his role eventually expanded. He became Mark Barney's right-hand man and served as liaison between Barney and other major distributors. Thompson, who had an ability to transport cocaine without arousing suspicion, made many flights transporting drugs. He also participated in the channeling of proceeds back to California. He was present when the Timothy Wooten Texas robbery and murder scheme was first discussed. Thompson was convicted on counts one, two, three and seventeen.

Timothy Wooten distributed large amounts of the enterprise's cocaine in Texas and participated in the money laundering operation that returned the proceeds to California. He was also involved in acts of violence. In November 1994, Tim Wooten discussed with Mike Whittaker, another enterprise dealer, a proposal to lure four of Whittaker's customers from Oklahoma to Paris, Texas, to purchase cocaine. The idea was for the four to be robbed and murdered so that Tim Wooten could repay a drug debt he owed to Mark Barney. The plan called for two of the Oklahomans to be shot in a hotel room while the other two would be shot at the

4

rural site of the supposed drug deal. A silencer would be used for the hotel room murders. The two Oklahomans at the rural site were murdered by Wilbert Watson. The other two escaped death. In February 1995, Mark Barney, in Ralph Thompson's presence, stated that something had to be done with Frankie Dunham, an employee of the enterprise who was cooperating with police. More meetings between Mark Barney and Tim Wooten followed. Tim Wooten murdered Dunham in May 1995, one week before she was to testify against Mark Barney in a state court proceeding. The jury found Tim Wooten guilty of counts one through seventeen.

Gerald Wooten, Tim Wooten's brother, was not charged under RICO, but was involved in a few incidents of delivering packages of cocaine and wiring of drug money back to California. The jury found Gerald Wooten guilty on counts three and seventeen.

## DISCUSSION

### A. Motions for Severance

Both Thompson and Gerald Wooten contend that the district court erred by failing to grant their motions for severance, thereby denying their rights to due process as guaranteed by the Sixth Amendment. Thompson argues that he was prejudiced because a significant part of the trial testimony dealt with the murders and attempted murders of the four Oklahomans. Thompson contends that he had no involvement, in these murders or the events surrounding them, beyond the inference that he delivered drugs to the leader of

5

the conspiracy Mark Barney. In addition, he complains that he was prejudiced by "graphic depictions and courtroom theatrics," including testimony from dentists identifying decomposed bodies and violent and gory photographs. The testimony was presented, Thompson argues, in such a manner as to shock the conscience. For example, while one witness testified about finding the bodies of murder victims, members of the victims' families were comforted and assisted out of the courtroom by Assistant United States Attorneys. For these reasons, Thompson requests that his conviction be vacated and that the matter be remanded for a new trial.

Gerald Wooten likewise argues that he was prejudiced to such an extent that he received an unfair trial. Similar to Thompson, he complains about the amount and nature of the evidence admitted as proof of the Paris, Texas murders. He also points to the fact that the Government attempted to link him to the murders and acts of violence by referencing telephone calls made to him on the night of the murders. These calls, he argues, left the jury with the impression that he had some role, albeit minor, in those murders. He also argues that his brother's fugitive status was prejudicial. Further, he submits that the judge did not provide adequate protection through the jury instructions because he did not clarify the fact that Gerald Wooten was not charged in the RICO count and must be distinguished from his co-defendants. For example, he complains that at one point the court incorrectly

6

advised that the indictment contained seventeen counts and that Ralph Nathaniel Thompson and Timothy *Gerald* Wooten, as opposed to Timothy Gardell Wooten, only are charged in count one. Finally, he argues that the court failed adequately to distinguish and separate the counts charged against him.

Federal Rule of Criminal Procedure 14 provides that a district court may order severance of defendants if it appears that a defendant is prejudiced by joinder. Fed. R. Crim. Pro. Rule 14. A district court's decision to deny a Rule 14 motion to sever is reviewed for abuse of discretion. United States v. Pasado-Rios, 158 F.3d 832, 863 (5th Cir. 1998). The general rule is that "'persons indicted together should be tried together, especially in conspiracy cases, and . . . the mere presence of a spillover effect does not ordinarily warrant severance . . . .'" *Id.* (quoting United States v. Moser, 123 F.3d 813, 828 (5th Cir. 1997) (quoting United States v. Pofahl, 990 F.2d 1456, 1483 (5th Cir. 1993))). A defendant's burden is two-fold. He must show first that "'the joint trial prejudiced him to such an extent that the district court could not provide adequate protection.'" United States v. Richards, 204 F.3d 177, 193 (5th Cir. 2000)(quoting United States v. McCord, 33 F.3d 1434, 1452 (5th Cir. 1994) (quoting United States v. DeVarona, 872 F.2d 114, 120-21 (5th Cir. 1989))). He must present "'clear, specific and compelling prejudice that resulted in an unfair trial" Posada-Rios, 158 F.3d at 863 (quoting

7

United States v. Bullock, 71 F.3d 171, 174 (5th Cir. 1995)), and "that he did not receive adequate protection from the potential prejudice of a joint trial through the court's instructions to the jury." Posada-Rios, 158 F.3d at 863. Second, he must show that "the prejudice outweighed the Government's interest in economy of judicial administration." Richards, 204 F.3d at 193.

The district court took various steps to lessen the prejudice to each defendant. During voir dire, the district court instructed the jury to consider separately the charges against each defendant. In his preliminary instructions to the jury, the court admonished them to give separate consideration to the case against each defendant. The jury charge likewise instructed:

> A separate crime is charged against one or more of the defendants in each count of the Superseding Indictment. Each count, and the evidence pertaining to it, should be considered separately. Also, the case of each defendant should be considered separately and individually. The fact that you may find one of the accused guilty or not guilty of any of the crimes charged should not control your verdict as to any other crime or other defendant. You must give separate consideration of the evidence as to each defendant.

This court has held virtually identical instructions sufficient, among other factors, to cure the possibility of prejudice. Pasado-Rios, 158 F.3d at 863-64; *see also* Richards, 204 F.3d at 194. Indeed, the Supreme Court has stated that "less drastic measures [than severance], such as limiting instructions, often will suffice

8

to cure any risk of prejudice." Zafiro v. United States, 506 U.S. 534, 539,  113 S.Ct. 933, 938 (1993).

Here, the court took another step by allowing the jurors to take notes during the trial. Posada-Rios, 158 F.3d at 863.  The jurors were also provided a copy of the indictment and written charge of the court during deliberations.  In addition, attempting to prevent the possibility of prejudice, the court gave a specific instruction to the jury, after the family members were led out, not to "draw any kind of inference at all from anyone being asked to leave the courtroom or leaving the courtroom.  Just put it out of your mind.  Ignore it.  Don't draw any inference at all from it."

Moreover, we have previously rejected the argument that evidence of crimes committed by co-conspirators, including gruesome murders, suffices to establish prejudice.  Posada-Rios, 158 F.3d at 863.  We have held that "the pernicious effect [of spillover] ... is best avoided by precise instructions to the jury on the admissibility and proper uses of the evidence introduced by the Government."  United States v. Harrelson, 754 F.2d 1153, 1175 (5th Cir. 1985).  Likewise, that there was a "large volume of evidence introduced" concerning the murders is not dispositive because "a quantitative disparity in the evidence 'is clearly insufficient in itself to justify severance.' "  U.S. v. Pettigrew, 77 F.3d 1500, 1517 (5th Cir. 1996)(quoting United States v. Neal, 27 F.3d 1035 (5th Cir. 1994)).

9

In addition, the Government correctly points out that Thompson was indicted for being part of an enterprise that enriched and protected its members, in part by committing and threatening "acts of violence including murder, attempted murder and robbery," and by promoting or engaging in activities "designed to prevent members and associates of the enterprise from disclosing the activities of the enterprise to law enforcement authorities." *See* Count 1, paras. 2a-3d. Although Thompson apparently did not know beforehand of the conspiracy to rob and kill the Oklahomans, Thompson continued his association with the enterprise and its members after learning of the murders.[2] He was an employee or associate of an enterprise with violent aspects, means and members. The Government contends that the prosecution could not have presented its case against any employee or associate of the "enterprise" without presenting all of the evidence to give an accurate depiction of the enterprise.

Testimony from Vincent Barney supports the Government's contention that Thompson had knowledge and was concerned about the investigation of Frankie Dunham's murder. Vincent Barney testified that his brother, Mark Barney, who later pled guilty to soliciting Dunham's murder, and Thompson, questioned him after the murder

---

[2] Specifically, Mark Barney testified that Tim Wooten told Barney and Thompson about the murders a day or so after they occurred, on January 6, 1996. Thompson was with Mark Barney, Tim Wooten and Whittaker in a hotel room when a plot to murder Preston was discussed. Likewise, the need to silence Frankie Dunham was discussed in Thompson's presence.

about whether or not homicide investigators had asked him questions about the murder. The two informed Vincent Barney that law enforcement had "nothing on us" and "were grabbing at straws." Vincent also testified that he knew that Mark Barney knew about and was upset that Frankie Dunham was a witness against him. Mark Barney testified that it was "important to all of us," including Thompson, that Frankie Dunham not testify again him. This was the case because if Barney "went down," Thompson, Tim Wooten and others, would not have access to Barney's suppliers. In sum, based on the judge's instructions and the evidence linking Thompson to the Dunham murder, the district court did not abuse its discretion by denying Thompson's motion to sever.

Likewise, the court did not err with respect to Gerald Wooten. In addition to the aforementioned instructions, the judge specifically instructed the jury that testimony from a witness about Frankie Dunham was "not to be considered at all for any purpose in connection with" Gerald Wooten.

We do not agree with Gerald Wooten's assertion that the district court's mispronunciation of his brother's name was prejudicial. The district court made this mistake during the preliminary instructions to the entire group of prospective jurors. During those same instructions, the judge correctly pronounced Tim Wooten's name many times. At the same time, the court asked the following of the venire members:

> They are all seated over there together, but I want to find out if you can give each one of the defendants the benefit of considering his case separately and considering the evidence against the defendant separately and not be influenced by the fact that he's seated at a counsel table with other defendants that are also charged, some charged in counts in which the defendant is not charged. Can you separate in your mind those three defendants and the evidence that is submitted against them?

The judge dismissed the two venire members who indicated that they would have difficulty making such a distinction.

Gerald's most sympathetic argument is that because of the prejudicial joinder, the Government implied that he played some part in the Oklahoman's murders. The only evidence of a connection came from records of telephone calls exchanged between the location of the murders, just after they were committed, and Gerald's workplace. Weak as the inference from these records might be, it seems the same evidence could have been offered for proof of his part in the conspiracy in a separate trial of Gerald. Regardless of that circumstance, this court has previously held that neither a disparity in the amount of evidence against each defendant, nor the fact that a defendant was only a minimal participant, constitutes prejudice. United States v. Fields, 72 F.3d 1200, 1215 (5th Cir. 1996); United States v. Krout 66 F.3d 1420, 1430 (5th Cir. 1995) (citing United States v. Neal, 27 F.3d at 1045). The court did not abuse its discretion in denying severance.

**B.   Sufficiency of the Evidence on the RICO convictions of Thompson and Tim Wooten**

12

Thompson and Tim Wooten submit that the evidence was insufficient to convict them on both the substantive and conspiracy RICO charges. When reviewing a sufficiency of the evidence challenge, this court does not "weigh the evidence or . . . determine the credibility of the witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469 (1962). The evidence need not exclude every reasonable hypothesis of innocence. United States v. Leed, 981 F.2d 202, 205 (5th Cir. 1993). If a rational trier of fact could have found each essential element of the offense established beyond a reasonable doubt, the verdict must be affirmed. Posada-Rios, 158 F.3d at 855.

The RICO statute charged in the indictment, 18 U.S.C. § 1962(c), prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." When establishing such a violation, the Government must prove "(1) the existence of an enterprise that affects interstate or foreign commerce, (2) that the defendant was 'employed by' or 'associated with' the enterprise, (3) that the defendant participated in the conduct of the enterprise's affairs, and (4) that the participation

13

was through a 'pattern of racketeering activity.'" <u>Posada-Rios</u>, 158 F.3d at 855 (citing <u>United States v. Erwin</u>, 793 F.2d 656, 670 (5th Cir. 1986)).  We review each of the elements.

**1. Enterprise**

18 U.S.C. § 1961(4) states that an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  This court has defined "enterprise" as "an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct."  <u>United States v. Williams</u>, 809 F.2d 1072, 1094 (5th Cir. 1987).  It may be "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  *Id.* (quoting <u>United States v. Turkette</u>, 452 U.S. 953, 99 S.Ct. 349 (1978)).  The enterprise "must have an existence separate and apart from the pattern of racketeering."  <u>Crowe v. Henry</u>, 43 F.3d 198, 205 (5th Cir. 1995).  The "continuing unit" may be "'shown by a hierarchical or consensual decision making structure.'" *Id*. at 205 (quoting <u>Delta Truck & Tractor, Inc.. v. J.I. Case Co.</u>, 855 F.2d 241, 243 (1988)).  In determining that an enterprise exists, we may also look to the "number of acts, their relationship, their having taken place over several years, and the consistent participation of the central

14

figures in the scheme." United States v. Doherty, 867 F.2d 47, 68 (1st Cir. 1989). A jury may "infer the existence of an enterprise on the basis of largely or wholly circumstantial evidence." United States v. Elliot, 571 F.2d 880, 898 (5th Cir. 1978).

Thompson argues that there was insufficient proof of an enterprise. He does not dispute that the Government's evidence supports a finding that a common or shared purpose existed. Rather, he argues that the Government lacked proof that the alleged structure had any continuity of structure and personality. *See* United States v. Bledsoe, 674 F.2d 647, 665 (8th Cir. 1982).[3] He argues that, contrary to the Government's contention, the alleged substitution of him into the place of Vincent Barney does not support this element because, according to the Government's evidence, he and Vincent Barney merely packaged the cocaine. In addition, he argues that the fact that the "enterprise activity" ceased after the arrest of Mark Barney provides strong evidence that the "enterprise" lacked continuity.

We decline to adopt the Bledsoe definition of enterprise. The record reveals sufficient evidence of a continuing unit with a consensual decisionmaking structure, as required by this circuit. As the Government argues, the evidence shows that the enterprise

---

[3] Bledsoe holds that an enterprise must have three elements: 1) a common or shared purpose; 2) continuity of structure and personality; and 3) an "'ascertainable structure' distinct from that inherent in the conduct of a pattern of racketeering activity." Bledsoe, 674 F.2d at 665.

15

consisted of its leader, Mark Barney, and his "team", including Ralph Thompson, Vincent Barney, Tim Wooten, Wilbert Watson, Mike Whittaker, and Kerwin "Buddy" Wade. Mark Barney brought members of the team together and organized connections among them. Their common goal was to enrich the members of the association by sharing the economic benefits of the enterprise and by preserving the organization.[4] This group, tracing through Mark Barney, formed lines of interdependence. For example, Mark Barney provided evidence of this interdependence when he testified that it was "important to all of us" that Frankie Dunham not testify against him, because it "would shut business down" and that those in Kansas, Texas and Colorado would "get cut off," including Tim Wooten and Ralph Thompson.

Mark Barney designated certain assignments for the team members. Vincent Barney scanned kilos of powdered cocaine that he got from "Chicalee," a supplier, cleaning them of metal fragments and re-packaging them. Thompson carried the kilos on commercial airlines and interacted with the public and other members of the organization. Thompson delivered drugs to Tim Wooten and Buddy Wade, and others, who in turn moved large quantities of cocaine through networks of cocaine dealers. They also kept a steady flow

---

[4] For example, Ralph Thompson occasionally profited by investing his own money into the overall price that Mark Barney paid for the cocaine. He would "invest" by putting in a certain percent of the price and paying that share of the overall cost of the transaction. In turn, he would receive the same percent of the profits.

of money into the office of the organization. When in trouble, members of the team worked to bail each other out. Members also met on different occasions to discuss the organization and various problems.

2. **"Employed By" or "Association With" the Enterprise**

The evidence shows that Thompson and Tim Wooten were "employed by" or "associated with" the enterprise. Thompson served as the liaison between Mark Barney and associates in Texas to whom he delivered kilos of cocaine for sale and distribution. He was the only other person who knew the name of Mark Barney's source. He understood the inner workings of the enterprise and interacted with many associates. He was the mediator between the field and the home office when Barney was absent. Other employees or associates prepared packages of cocaine for him to pick up. Frankie Dunham made airplane and hotel reservations for him. Transportation, such as limousine rentals, was often arranged for him. He traveled frequently for the enterprise. While he began as an employee, he later became an investor or partner, sharing both the costs and profits of the enterprise.

According to testimony from Vincent Barney, Tim Wooten served as the key distributor of cocaine in the Dallas, Texas area, and as the conduit of cocaine between Mark Barney and others. He supplied both his brother, Gerald Wooten, and Wilbert Watson. In addition, he brought Mike Whittaker into the enterprise. At one

17

point, Whittaker and Wooten flew to California to meet with Mark Barney and to receive cocaine. Tim Wooten delegated to Whittaker the responsibility of supplying cocaine to Gerald Wooten and Wilbert Watson.

### 3. Participation in the Conduct of the Enterprise's Affairs

Both Thompson and Tim Wooten argue that the Government did not establish that they participated in the conduct of the enterprise's affairs as required by Reves v. Ernst & Young, 507 U.S. 170, 113 S.Ct. 1163 (1993). In particular, they argue the Government did not meet the "operation and management" test set forth in Reves because neither took part in directing the affairs of the enterprise. Thompson contends that he was a "mere 'mule'", and Wooten submits that he was a "mere 'party'" or a "user."

Contrary to the appellants' contention, Reves does not require that a defendant direct the affairs of the enterprise. Posada-Rios, 158 F.3d at 856 ("Although such evidence [of decision-making power] would certainly be relevant to show that a defendant participated in the operation of an enterprise, Reves does not require it."). In Reves, the Supreme Court held that a conviction under § 1962(c) required that "one must participate in the operation or management of the enterprise itself." Reves, 507 U.S. at 185, 113 S.Ct. at 1173. The term "participate" was meant to have the "common understanding of the word . . . to take part in." *Id.* at 179, 113 S.Ct. at 1170. This court noted in Posada-Rios

18

that the Supreme Court "specifically rejected the D.C. Circuit's suggestion that § 1962(c) requires significant control over or within an enterprise." Posada-Rios, 158 F.3d at 856 (citing Reves, 507 U.S. at 179 n.4, 113 S.Ct. at 1170 n.4). Rather, "[t]he [Reves] Court held that 'the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs." *Id.* (quoting Reves, 507 U.S. at 179, 113 S.Ct. at 1170). In particular, the Reves Court explained that an enterprise may be 'operated' both by upper management and by lower rung participants. *Id. (*quoting Reves, 507 U.S. at 184, 113 S.Ct. at 1173). For example, in Posada-Rios, this court found that a mid-level distributor participated in the operation "by deciding how much cocaine to buy and what prices and terms to charge to the lower-level distributors to whom he redistributed the cocaine." *Id.* As has been described at length above, the evidence is sufficient to show that Tim Wooten and Thompson were operational participants as required by Reves, and that Thompson participated in the management.

### 4.    Pattern of Racketeering Activity

Tim Wooten argues that the Government failed to establish that there was a pattern of racketeering activity. In particular, he submits that the Government did not prove that there was a continuing threat of criminal activity. He points to the fact that

19

the last relevant act alleged in the indictment occurred more than two years before the date of the second superseding indictment.  He also states that the Government did not allege any criminal violation between August 1995 and the time that Wooten and his co-defendants were incarcerated in 1998.  Finally, he states that following Mark Barney's conviction and incarceration, the enterprise ceased without law enforcement intervention.

18 U.S.C. § 1651(5) states that establishing a "pattern of racketeering activity" requires that at least two racketeering predicates were committed within a 10-year period.  The Supreme Court, in H.J., Inc. v. Northwestern Bell Telephone Co.,held that this element requires that a plaintiff or prosecutor show both "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."  492 U.S. 229, 239, 109 S.Ct. 2893, 2900 (1989).  Wooten challenges only the continuity element of the "pattern of racketeering" requirement.

The continuity requirement stems from Congress's concern "in RICO with long-term criminal conduct."  *Id.* at 242, 109 S.Ct. at 2902.  H.J., Inc. stated that 'continuity' may refer to either a closed-ended or an open-ended period.  *Id.* at 241, 109 S.Ct. at 2901.  This case may be evaluated under the closed-ended concept because it involves a closed period of repeated conduct.  By contrast, an open-ended period would involve "past conduct that by

20

its nature projects into the future with a threat of repetition."

*Id.*[5]  Both are temporal concepts.

Sufficient proof of continuity over a closed period may be demonstrated "by providing a series of related predicates extending over a substantial period of time."  *Id.* at 242, 109 S.Ct. at 2902.  H.J., Inc. gave little direction as to what may constitute a "substantial period of time" other than stating that "[p]redicate acts extending over a few weeks or months and threatening no criminal conduct do not satisfy this requirement." *Id.*  This court has held that seven months is an insufficient period of time, *see*  Tel-phonic Services, Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1140 (5th Cir. 1992), but that two racketeering acts extending nearly four years suffices, *see* United States v. Bustamante, 45 F.3d 933, 941-42 (5th Cir. 1995).

Wooten does not contest the time period between the first and last predicate acts.  The evidence showed that the enterprise spanned 20-21 months, beginning in December 1993 and ending in

---

[5]     The Government believes that it has also provided sufficient evidence for an open-ended concept.  As to the open-ended concept, the Government asks that this court follow United States v. Richardson, 167 F.3d 621, 625-26 (D.C. Cir 1999) which held that although a defendant's four predicate acts spanned only thirty-four days and the entire crime spree only three and one-half months, the "'fortuitous interruption of [racketeering] activity such as by an arrest' does not grant defendants a free pass to evade RICO charges."  *Id.* (quoting United States v. Busacca, 966 F.2d 232, 236 (6th Cir. 1991)).  The court held that the defendant's pre-arrest conduct was of such frequency and increasing seriousness that a jury could find that the predicate acts of racketeering, by their very nature, "projected into the future with a threat of repetition."  *Id.*  Because we find that the Government satisfied its burden under the closed-ended concept, we need not address whether the open-ended concept applies.

August 1995. Following our sister circuits, we hold that 20-21 months is a sufficient time period to establish continuity. *See* Allwaste, Inc. v. Hecht, 65 F.3d 1523, 1528 (9th Cir. 1995) (thirteen months could demonstrate a "substantial period of time" to satisfy the continuity requirement); United States v. Pelullo, 964 F.2d 193, 209 (3rd Cir. 1992)(a jury could find a period of nineteen months sufficient for a finding of continuity); United States. v. Freeman, 6 F.3d 586, 596 (9th Cir. 1993)(two years); Resolution Trust Corp. v. Stone, 998 F.2d 1534, 1543 (10th Cir. 1993)(eighteen months); Metromedia Co. v. Fugazy, 983 F.2d 350, 369 (2nd Cir. 1992)(two years); United States v. Stodola, 953 F.2d 266, 270 (7th Cir. 1992)(twenty months). Contrary to Wooten's contention, therefore, the continuity requirement did not necessitate that the Government allege a continuation of unlawful acts during the period from August 1995 until his incarceration in 1998.

**5.  Count 2-RICO Conspiracy**

Both Thompson and Tim Wooten challenge the sufficiency of evidence as to Count 2, the RICO conspiracy charge. Neither, however, explains in what respect the evidence is insufficient or develops his insufficiency argument. The briefs contain no argument or discussion of the facts as related to the RICO conspiracy charge. They have not complied with the requirements of

22

Fed. R. App. P. 28(a)(9) and have waived this issue. *See* Posada-Rios, 158 F.3d at 867.

## C.  Jury Verdict Form

Thompson and Tim Wooten argue that the failure to require the jury to designate in its verdict form which specific acts were unanimously agreed upon to support the "pattern of racketeering activity" element, denied them due process. Both concede that the jury was properly instructed, but they assert that because the verdict form required only a general finding of guilt as to Count one of the indictment, they are unable to determine and test on which specific acts the jury relied to support the guilty verdicts. Neither objected to the verdict form at trial.

Since the defendants did not object to the verdict form during trial, we review these claims for plain error. *See* United States v. Jones, 132 F.3d 232, 245 (5th Cir. 1998). A district court has the discretion to decide whether to submit special interrogatories as to each element of an offense to the jury. United States v. Console, 13 F.3d 641, 663 (3d Cir. 1993). *See also* Griffin v. United States, 502 U.S. 46, 47, 112 S.Ct. 466, 473 (1991). There is no right to a verdict on each element of an offense. *Id.* Confusion created by a verdict form may be cured by a jury instruction. Jones, 132 F.3d at 245. *See also* United States v. Flores, 63 F.3d 1342, 1374 (5th Cir. 1995). Where a

23

district court properly instructs the jury on the elements of a RICO conspiracy violation and, in particular, the requirement of unanimity regarding the predicate offenses, we do not find plain error. *See* United States v. Shenberg, 89 F.3d 1461, 1472 (11th Cir. 1996)(holding that a district court did not abuse its discretion when it gave a proper unanimity instruction but denied a request for a special verdict form).

The district court judge instructed the jury that:

> At a minimum, a pattern of racketeering activity requires at least two acts of racketeering activity within ten years of each; provided, however, that the government proves the relationship and continuity of those acts as I have defined them for you. All of you must be unanimous as to which racketeering acts you each believe beyond a reasonable doubt that the defendant under consideration committed. <u>Unless you are unanimous in finding beyond a reasonable doubt that the defendant under consideration committed a racketeering act charged, you must disregard that act in deciding whether that defendant is guilty or not guilty of racketeering</u>. It is not sufficient that some of the jurors find that the defendant committed two of the acts while others of you find that the defendant committed different acts. (emphasis added).

"We presume that a jury follows the court's instructions." *Id*. (citing United States v. Stone, 9 F.3d 934, 938 (11th Cir. 1993)). The appellants provide no reason to doubt that this jury properly followed the court's instructions. The district court did not plainly err by submitting a general verdict form.[6]

---

[6] Tim Wooten relies on Richardson v. United States, 526 U.S. 813, 119 S.Ct. 1707 (1999), where the Supreme Court held that the Continuing Criminal Enterprise States (the "CCE" statute), which requires that the Government prove

### D. Money Laundering Conspiracy

Both Gerald Wooten and Ralph Thompson challenge the sufficiency of the evidence to convict them for conspiracy to commit money laundering transactions in violation of 18 U.S.C. § 1965(h), as alleged in Count 17.  A conviction for conspiracy to launder money requires that the Government prove five elements:

> (1) there is a conspiratorial agreement, (2) one conspirator knowingly commits an overt act by participating in a financial transaction, (3) the financial transaction involves the proceeds of an unlawful activity, (4) the conspirator participating in the transaction had the intent to promote or further that unlawful activity, and (5) the transaction affected interstate or foreign commerce.

United States v. Fierro, 38 F.3d 761, 768 (5th Cir. 1994).

Thompson argues on appeal that the Government did not present sufficient evidence to establish his overt acts.  Count 17 of the indictment lists fifty-one overt acts of money laundering.  Thompson is the designated sender of a money transfer through Western Union in Act 2 and the designated recipient of money transfers through Western Union in Acts 47 and 48.  Thompson's only contention is that the Government did not present sufficient

---

that a current drug violation "is a part of continuing series of violations," 21 U.S.C. § 848(a), requires that the jury unanimously agree about which specific violations the defendant had committed.  Richardson is inapplicable to our review of the verdict form in this RICO case.  *See generally* United States v. Meshack, 225 F.3d 556, 580 (5th Cir. 2000) (finding that Richardson is generally inapplicable to a money laundering statute).  First, the Court's conclusion was *based on* an extensive statutory analysis of the CCE statute.  Second, the Richardson defendant's request for a specific unanimity instruction, not for a special verdict form, was at issue.  Here, there is no contention that the judge did not give the appropriate unanimity instruction.

evidence to prove that the Act 2 sender and Acts 47 and 48 recipient were, in fact, Thompson.  We disagree.

Regarding Act 2, Ralph Thompson's name appears as the sender and Vincent Barney as the recipient in Western Union documents.  Vincent Barney verified that Thompson sent and that Barney received the money transfer, which was for drug proceeds. As to Acts 47 and 48, a Western Union representative testified that Ralph Thompson's name appeared as the recipient of the money transfer and that proof of recipients' identification is always checked for money transfers over $500.  Act 47 involved a transfer of $2,000 from Tim Wooten to Thompson; Act 48 involved a transfer of $1,330 from Tim Wooten to Thompson.

Gerald Wooten also contends that the Government failed to prove by a reasonable doubt that he knew the proceeds involved an illegal activity or that he intended to promote or further an illegal activity.  We find that a juror could make such inferences. Western Union records list Gerald as the sender in Acts 22 and 37. Wooten admitted to sending the two Western Union wire transfers to Vincent Barney and told a Special Agent that "he felt that what he was doing was a relatively minor thing and there was little chance he would get caught."  This statement supports the inference that Gerald knew that the money was for the proceeds of illegal activity.  While Gerald's involvement may have been minor, only one

26

overt act is required to prove that a defendant was involved in a money laundering conspiracy.

**E.    Conspiracy to Possess With Intent to Deliver a Controlled Substance**

**1.    Ralph Thompson and Tim Wooten**

All three Appellants argue that the evidence was insufficient to support their convictions for violation of 21 U.S.C. § 846, conspiracy to possess with intent to deliver a controlled substance. Thompson contends that the Government's evidence consisted of circumstantial evidence "woven together" by the "purchased testimony from the likes of Mark Barney, Vincent Barney and Kelly Sorbellini."  He argues that the volumes of telephone records, flight records and hotel records do not positively identify him.  In addition, he asserts that the Government never presented any contraband obtained from Thompson, or photographic, audio or video evidence supporting the Government's claims.  Tim Wooten likewise argues that there was no evidence that he intended to join or associate himself with the objective of the conspiracy and complains that all of the evidence against him comes from "paid informants."

"To establish guilt of a drug conspiracy under 21 U.S.C. § 846, the Government must prove that (1) there was an agreement between two or more persons to import or possess controlled substances with intent to distribute; (2) each defendant knew of

27

the conspiracy and intended to join it; and (3) each defendant voluntarily participated in the conspiracy." United States v. Mitchell, 31 F.3d 271, 274 (5th Cir. 1994). All elements must be proven, but all may be inferred from circumstantial evidence. United States v. Espinoza-Seanez, 862 F.2d 526, 537 (5th Cir. 1989). "Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation . . . be sufficient to constitute conclusive proof." Mitchell, 31 F.3d at 274 (quoting United States v. Lechuga, 888 F.2d 1472, 1476 (5th Cir. 1989)). As such, "an agreement may be inferred from a 'concert of action.'" Espinoza-Seanez, 862 F.2d at 536 (quoting United States v. Vergara, 687 F.2d 57, 61 (5th Cir. 1982)). "Knowledge may be inferred from 'surrounding circumstances.'" *Id.* (quoting Vergara, 687 F.2d at 61). "Voluntary participation may be inferred from 'a collocation of circumstances.'" *Id.* (quoting United States v. Marx, 635 F.2d 436, 439 (5th Cir. 1981)). Most importantly, for our purposes, "'[a]s long as it is not factually insubstantial or incredible, the uncorroborated testimony of a co-conspirator, even one who has chosen to cooperate with the Government in exchange for non-prosecution or leniency, may be constitutionally sufficient evidence to convict.'" United States v. Meshack, 225 F.3d 556, 566 (5th Cir. 2000)(quoting United States v. Westbrook, 119 F.3d 1176, 1189-90 (5th Cir. 1997)). Therefore, although it is true that much of the evidence came from the testimony of co-conspirators who had

28

chosen to cooperate with the Government, their testimony suffices. Indeed, similar to Meshack, the Government's evidence implicating Thompson was voluminous. Arguments about the credibility of the Government's witnesses were presented to the jury. Such credibility determinations are for the jury, not the court, to decide. *See* Meshack, 225 F.3d at 567 n6.

The Government's evidence showed that Thompson voluntarily and knowingly joined in an agreement with Mark Barney and others to distribute cocaine and possess cocaine with the intent to distribute. His involvement began with an agreement to deliver cocaine to Texas, Kansas and Colorado. He eventually became an investor, sharing in the costs and profits. His repeated trips to deliver large quantities of cocaine to Tim Wooten, who in turn distributed cocaine to others, provides sufficient evidence of an agreement. Both were intimately involved in the actual distribution of what they both knew to be cocaine. Their repeated acts furthering the distribution of cocaine manifest their knowing and voluntary participation in the conspiracy. They were also both aware that the business involved others. Indeed, they coordinated their efforts with other members of the conspiracy. Testimony from Vincent Barney and Whittaker verified that Thompson made deliveries of cocaine to Tim Wooten. Kerwin "Buddy" Wade testified that Thompson served as a courier for his drug payments to Mark Barney. Vincent Barney also gave extensive testimony about Thompson's

29

involvement. He testified that Thompson was primarily the drug courier who would transport packages of cocaine by plane. Vincent Barney described the system by which Thompson would pack the cocaine in his carry-on luggage to avoid detection. He testified that Thompson received about a thousand dollars for each kilogram of cocaine. According to Vincent Barney, Thompson made about twenty such trips. Mark Barney likewise discussed Ralph Thompson's involvement in the business.

Vincent Barney also testified about Tim Wooten's role as the primary distributor of cocaine in Dallas, Texas. Tim Wooten would receive the cocaine either from Thompson or by Federal Express. Vincent testified that he sent between ten and twenty shipments of drugs to Tim Wooten, ranging from two ounces to half a kilogram of cocaine. Vincent Barney also verified that he received a number of money wire transfers from Wooten as proceeds from drug transactions.

Mark Barney also testified that Tim Wooten brought Whittaker into the enterprise and that Wooten and Whittaker flew to California on one occasion to meet with Mark Barney and to receive cocaine. There was testimony that Tim Wooten delegated to Whittaker the responsibility of supplying cocaine to Gerald Wooten and Wilbert Watson. Mark Barney stated that Tim Wooten and Buddy Wade were his contacts in Texas, meaning that they were the people he sold drugs to in Texas. In addition, when Tim Wooten was

30

arrested for drug dealing, Gerald Wooten contacted Mark Barney, who started arranging money for Tim Wooten's bail. Mark Barney also testified that Tim Wooten introduced him to a man named Lay-Low in order to facilitate a drug transaction.

The Government also presented telephone records indicating that the co-conspirators, including Tim Wooten and Ralph Thompson, communicated with each other hundreds of times. For example, there were 146 calls from numbers associated with Ralph Thompson to numbers associated with Tim Wooten. There were sixty-three calls between numbers associated with Ralph Thompson and Whittaker.

The evidence was sufficient to establish that both Ralph Thompson and Tim Wooten were part of an agreement to possess cocaine with intent to distribute, that they knew about and joined the conspiracy and that their participation was voluntary.

### 2. Gerald Wooten

The Government's case against Gerald Wooten is weaker than that against Tim Wooten and Ralph Thompson. However, after a careful review of the record, this court finds that there was sufficient evidence for a rational trier of fact to find Gerald Wooten guilty of the drug conspiracy.

The Government presented evidence that Gerald had knowledge of the conspiracy and intended to join it. First, as discussed above, an agent testified that Gerald Wooten told him

31

that "what he was doing [receiving one or two packages for Tim and sending funds via Western Union on Tim's or Whittaker's behalf] was a relatively minor thing and that there was little chance that he would get caught." Vincent Barney testified that he received two wire transfers from Gerald Wooten that were proceeds from a drug transaction. Vincent worked out the details of the wire transfer over the phone after contacting Gerald Wooten and based on Tim Wooten's instruction. Western Union documents confirm that these two transfers, for $2,000 and $1,425, were sent from Gerald Wooten to Vincent Barney. Mike Whittaker testified that Gerald made initial contact with Whittaker. He also testified that when he came to pick up a package of drugs, Gerald "knew why I was there" and gave him the package. Another witness, Luther Moore, testified that Gerald Wooten said that he could get drugs from Tim Wooten.

Likewise, the jury could rationally infer that Gerald Wooten voluntarily participated in the conspiracy. Whittaker testified that as he started working closer with Tim, he also started working with Gerald by providing him with drugs to sell. It was his understanding that prior to that, Tim was to supply Gerald with drugs. In addition, Whittaker testified about an incident where Tim Wooten owed a debt to Mark Barney because Gerald gave too much cocaine to someone in a drug transaction who ran off with the extra cocaine.

F.    Typographical Error in the Indictment

32

Tim Wooten claims that the district court erred in denying his Motion for Judgment of Acquittal when he requested that the district court set aside the verdict against him on counts 12, 13, 14 and 17 because the indictment contained an incorrect date. Those counts state that Tim Wooten committed certain crimes "on or about January 4, 1994," instead of January 4, 1995.

The district court instructed the jury as follows:

> You will note that the Second Superseding Indictment charges that the offenses were committed 'on or about' a certain date. The Government does not have to prove with certainty the exact date of the alleged offense. It is sufficient if the Government proves beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged.

During their deliberations, the jury sent a note to the district court asking for clarification on the dates of these counts. The district court answered the jury's note as follows:

> I cannot clarify the dates for you. I instruct you to consider all of the evidence in this case and the instructions the Court has given you, consider all of the instructions the Court has previously given you.

Rule 12(b)(2) of the Federal Rules of Criminal Procedure states that defenses and objections based on defects in the indictment must be raised before trial. "Failure to comply with this requirement results in waiver of the objection." United States v. Lerma, 657 F.2d 786, 790 (5th Cir. 1981). Tim Wooten did not file an objection prior to trial. Moreover, even if the objection was timely, "an allegation as to the time of the offense

33

is not an essential element of the offense charged in the indictment." Russell v. United States, 429 F.2d 237, 238 (5th Cir. 1970). Accordingly, this court denies Tim Wooten's request for relief based on the flawed indictment.

## G. Constitutionality of 18 U.S.C. § 922(g)

Tim Wooten challenges his conviction in count 12 for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). He acknowledges that this court's precedent affords no relief, but raises constitutional issues, albeit for the first time on appeal, merely to preserve review. They are in any event foreclosed by this court's precedent. United States v. Rawls, 85 F.3d 240, 242-43 (5th Cir. 1996).

## H. Charge against Tim Wooten for Aiding and Abetting in the Use and/or Carrying of a Firearm in Relation to a Crime of Violence

Tim Wooten contends that his conviction on count fifteen for using or carrying a silenced firearm during a crime of violence, 18 U.S.C. § 924(c)(1), is invalid under Bailey v. United States, 516 U.S. 137, 116 S.Ct. 501 (1995). He argues that the Government failed to meet the requirements of Bailey because it did not prove that he actively used or employed a gun or silencer.

Wooten ignores the fact that this count was brought against him for knowingly aiding, abetting, counseling, commanding, inducing and procuring Serdaris Jemal Preston in the use and the carrying of a firearm during and in relation to a crime of violence

34

for which Wooten was prosecuted. *See* 18 U.S.C. § 924 (c)(1) and (2). An aider and abettor need not actively use or employ the weapon. *See* <u>United States v. Wainuskis</u>, 138 F.3d 183, 188 (5th Cir. 1998). Rather, in order for a defendant to be convicted of aiding and abetting the § 924(c)(1) offense, under the use prong, the Government must prove that he "act[ed] with the knowledge or specific intent of advancing the 'use' of the firearm in relation to the drug trafficking offense." <u>United States v. Sorrells</u>, 145 F.3d 744, 753 (5th Cir. 1998). In addition, "'there must also be proof that the defendant performed some affirmative act relating to the firearm.'" *Id.* at 754 (quoting <u>United States v. Giraldo</u>, 80 F.3d 667, 676 (2d Cir. 1996)(knowledge of the presence of firearms). Wooten failed to argue, much less demonstrate, that the Government did not meet its burden with respect to Count 15. His challenge is without merit.

## I. Motion in Limine for Defendant's Closing Argument

At the close of trial, the Government filed a motion in limine seeking to prevent Gerald Wooten's counsel from comparing Gerald Wooten's conduct with that of other uncharged or immunized witnesses. Wooten's attorney wanted to compare his client's conduct with those who had done similar acts but were not prosecuted. This included examples of those who wired money and delivered packages to others involved in the conspiracy. Wooten

35

argues that the court erred by not allowing his counsel to summarize this "relevant and material" evidence in a fashion that would assist his defense. He claims that this error violated his Sixth Amendment right of cross examination by effectively nullifying his cross examination of various witnesses.

The Government submits that its motion in limine was directed at preventing jury nullification, and that the district court had the power to prevent this type of argument. In particular, the motion in limine requested that the court prevent counsel for the defendants from mentioning the following:

> Any type of comparison during closing argument of the arguably criminal acts of immunized or uncharged witnesses to the alleged criminal acts of a Defendant. Such argument is objectionable in that it inherently advocates jury nullification of the Defendant's alleged criminal acts.

We review a district court's decision regarding closing arguments for abuse of discretion. Bernard v. IBP, Inc. of Nebraska, 154 F.3d 259, 266 (5th Cir. 1998). "A judge has wide discretion to control the material presented by counsel in closing argument." United States v. Taylor, 680 F.2d 378, 380 (5th Cir. 1982).

In United States v. Leach, this court stated in dicta that jury nullification, "the right of a jury to acquit for whatever reasons even though the evidence supports a conviction[,] is an important part of the jury trial system." 632 F.2d 1337, 1341 n.12. (5th Cir. 1980). As such, this court recognized that

36

a jury may acquit based on its determination that the number of witnesses allowed to plead guilty to reduced charges in exchange for their testimony render it unfair to convict the defendant. *Id.* That a jury has the power to base its verdict on such a reason does not, by implication, mean that defense counsel has a right to make an argument encouraging the jury to do so. Indeed, we have noted that courts "have almost uniformly held that a criminal defendant is not entitled to an instruction that points up the existence of that practical power to his jury." Washington v. Watkins, 655 F.2d 1346, 1374 n.54 (5th Cir. 1981). Jury nullification is not a "right" belonging to the defendant. United States v. Gonzalez, 110 F.3d 936, 947-48 (2d Cir. 1997).

A criminal defendant has a Sixth Amendment right to present a proper closing argument based "on the evidence and the applicable law in his favor." United States v. Martinez, 974 F.2d 589, 591 (5th Cir. 1992). Here, Gerald's lawyer made a comprehensive closing argument without encouraging nullification. Like other circuits, we hold that the right to make closing argument does not include the right to have counsel make an improper argument encouraging the jury to use its "de facto power to refuse to apply the law as instructed by the court [and] exercise . . . such power in dereliction of the jury's sworn duty." United States v. Funches, 135 F.3d 1405, 1408 (11th Cir. 1998); *see also* United States v. Thomas, 116 F.3d 606, 614 (2d Cir. 1997)("We

37

categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent."). "A trial judge . . . may block defense attorneys' attempts to serenade a jury with the siren song of nullification. . . ." United States v. Sepulveda, 15 F.3d 1161, 1190 (1st Cir. 1993). Given that the district court forbade Gerald Wooten from mentioning only those facts that were intended to tempt jurors to violate their oaths, the district court's grant of the Government's motion was not an abuse of discretion.

## J. Gerald Wooten's Requested Jury Instruction on a Lesser Included Offense

Gerald Wooten was convicted on Count 3, conspiracy to distribute cocaine. He submitted jury instructions that provided for the lesser included offense of simple possession of cocaine. However, Gerald Wooten never objected to the district court's instructions that did not include his requested instruction. Where a defendant does not object to jury instructions at trial, this court reviews the instruction for plain error. United States v. Winn, 948 F.2d 145, 159 (5th Cir. 1991). "The 'plain error' exception shall not be invoked unless when we consider the charge as a whole, we conclude that it is so clearly erroneous that the result would be a grave miscarriage of justice or seriously affects

the fairness, integrity, or public reputation of judicial proceedings." *Id*. at 156-60.

The defendant is entitled to a lesser included offense instruction if: 1) the elements of the lesser offense are a "subset of the elements of the charged offense;" and 2) the evidence is such that "a jury could rationally find the defendant guilty of the lesser offense and not guilty of the charged offense." United States v. Harrison, 55 F.3d 163, 166 (5th Cir. 1995). "Simple possession is not a lesser included offense of a drug conspiracy. . . ." United States v. Krout, 66 F.3d 1420, 1432 (5th Cir. 1995). Thus, as a matter of law, Gerald was not entitled to the lesser included offense instruction he sought. That the evidence indicated Gerald could also have been found guilty of simple possession is irrelevant.

## K. Sentencing

### 1. Ralph Thompson

Thompson argues that the district court erred in its sentencing by finding that the murder of Frankie Dunham was reasonably foreseeable to him and holding that U.S.S.G. § 2D1.1(D)1, 2A1.1(a) applied.

"The factual findings made by a district court in its determination of a defendant's relevant conduct for sentencing purposes are subject to the 'clearly erroneous' standard of review

on appeal." United States v. McCaskey, 9 F.3d 368, 372 (5th Cir. 1993). "The district court's sentence will be upheld so long as it results from a correct application of the guidelines to factual findings that are not clearly erroneous." *Id.*

The district court found that it was reasonably foreseeable to Thompson that Frankie Dunham would be killed or eliminated as a witness against Mark Barney. In particular, the district court fond that the only reasonable interpretation of the conversation about Frankie Dunham at the Hyatt Hotel in Dallas was that she needed to be eliminated. This factual finding was not clearly erroneous.

### 2. Gerald Wooten

Gerald Wooten submits that the district court abused its discretion when it denied him a downward departure at sentencing. Wooten incorrectly relies on United States v. Luqman, 130 F.3d 113 (5th Cir. 1997) for the proposition that we review a requested downward departure for abuse of discretion. The correct rule is that a refusal to grant a downward departure is not reviewable unless the district court committed legal error in believing that it did not have the power to grant the downward departure. *Id.* at 115. "[W]e have no jurisdiction if the court's refusal is based on its determination that departure is not warranted on the facts of the case." *Id.* Wooten does not claim that the district court

40

erroneously believed it could not grant the requested downward departure. He contends only that the district court abused its discretion in failing to do so. This decision is not reviewable.

3. **Apprendi**

Ralph Thompson requests that this court remand his case for resentencing in light of the Supreme Court's holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000). As the Appellants' briefs were due on or before June 23, 2000, they did not mention Apprendi, because that decision had not yet been issued by the Supreme Court. Nevertheless, Apprendi was decided on June 26, 2000, yet Thompson then waited until October 27, 2000, to file a letter citing supplemental authority. Both Thompson and the Government submitted supplemental briefs addressing this issue at the court's request after oral argument on November 6, 2000.

Federal Rule of Appellate Procedure 28(j) permits a party to file supplemental materials if pertinent authorities come to a party's attention after the party's brief has been filed. However, the Rule states that the party must do so "promptly." Fed. R. App. Proc. 28(j). Thompson's initial filing on this issue was not prompt. As a result, we are inclined to deem this argument waived.

Nonetheless, on the merits, Thompson's Apprendi argument must fail. He did not object in the trial court to an alleged failure to instruct the jury on a material issue in the crimes he was charged with. Appellate review, therefore, takes place under

41

the plain error standard. The demanding plain error standard leaves this court with discretion not to reverse unless the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" Meshack, 225 F.3d at 577 (quoting United States v. Franks, 46 F.3d 402, 404 (5th Cir. 1995)). We would so exercise our discretion here. There was no dispute at trial that the quantity of cocaine involved in the offense was greater than 5 kilograms, which alone justifies his life sentence. See 21 U.S.C. § 841(b)(1)(A)(ii); 21 U.S.C. § 846. "No 'miscarriage of justice' will result here if we do not notice the error." Johnson v. United States, 520 U.S. 461, 467, 117 S.Ct. 1544, 1550 (1997)(quoting United States v. Olano, 507 U.S. 725, 736, 113 S.Ct. 1770, 1779 (1993)).

## CONCLUSION

For the foregoing reasons, this court AFFIRMS the convictions and sentences of the three Appellants.

**AFFIRMED.**

42

Garwood, Circuit Judge dissenting in part.

I concur in all of Judge Jones' cogent opinion except insofar as it deals with the denial of Gerald Wooten's motion for severance. While I have no disagreement with the majority's explication of the general rules related to this issue, I am unable to agree with their application of those principles to the particular facts of Gerald Wooten's case.

Of the seventeen counts which went to trial, thirteen involved violence, including three murders and two attempted murders, and two were felon in possession of firearm and possession of an unregistered silencer. Gerald Wooten was not charged in any of these counts, but only with conspiracy to distribute cocaine and money laundering conspiracy, neither of which counts alleged any violence or attempted violence or weapons possession. The evidence to sustain Gerald Wooten's conviction on these two counts though minimally adequate was thin indeed and at most tended to show that he was a minor, local player in those endeavors. At trial, the government improperly tried to insinuate that Gerald Wooten may have been connected to the murders and attempted murders of the Oklahomans, because shortly after those events his brother, who was complicit in those offenses, called Gerald Wooten's phone number, and this was emphasized in the government's closing argument. Surely, in any trial on only the counts charging Gerald Wooten,

43

this evidence and the related argument would have been excluded as irrelevant or at least under Fed. R. Evid. 403. In this setting, it was impossible for Gerald Wooten to receive a fair trial, and it is evident that he was severely prejudiced by the denial of his motion for severance. *See, e.g., U.S. v. DiNome*, 954 F.2d 839, 844-45 (2d Cir. 1992).

In my opinion, the trial court abused its discretion in denying Gerald Wooten's motion for severance, and we should for this reason reverse Gerald Wooten's conviction and remand the case against him for a new trial. I respectfully dissent from the majority's holding to the contrary.